**United States District Court**
**For The**
**Middle District of Florida**
**Orlando Division**

**COMPLAINT FOR A CIVIL CASE**

6:22-cv-324-CEM-LHP

**Case No:**

**Jury Trial  No**

(Plaintiff, Pro Se)
Michael R. Meade
P. O. Box 5404
Winter Park, Florida 32793
(407) 692-4396

2022 FEB 11  PM 12: 36
MIDDLE DISTRICT COURT
DISTRICT OF FLORIDA
ORLANDO, FLORIDA
FILED

VS

(Defendant)

**Secretary of the Army**
 101 Army Pentagon
Washington, DC 20310
Tel: 703-695-1717

Army Board for Correction of Military Records (ABCMR)
251 18th Street South, Suite 385
Arlington, Virginia 22202-3531

Plaintiff sues the United States under 28 U.S.C. § 1331 Federal Question,

arising under the United States Constitution or federal laws or treaties

using the **Administrative** Procedure Act, 5 U.S.C. §§ 701, *et seq.* ("APA"),

arguing that the ABCMR's **final decision** in case 20180007621, didn't

"minimally contain `a rational connection between the facts found and the

choice made.'" *Id. (quoting Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43, 103

S.Ct. 2856). (Refer to the 8-page letter from the ABCMR to Meade, Michael

R, referencing case 20180007621, dated June 08, 2021, stating they rendered a **final decision** on my application to correct military records from an Other Than Honorable (OTH) Discharge, to a General Discharge, under Honorable Conditions.

> [i] **Footnote: See 8-page ABCMR final decision in case 20180007621 below.**

The ABCMR's final decision denying the application to upgrade my discharge from Other Than Honorable (OTH) to fully Honorable, was arbitrary, capricious, and unlawful because it failed to respond to several of Plaintiff's non-frivolous arguments and misapplied the presumption of **administrative** regularity. The Board's action must be supported by reasoned decisionmaking," *Haselwander v. McHugh,* 774 F.3d 990, 996, No. 12–5297, 2014 WL 7234775, at *6 (D.C.Cir. Dec. 19, 2014) (internal quotation marks omitted), and its decision must respond to all of a plaintiff's non-frivolous arguments that have the potential to affect the Board's ultimate decision, *Frizelle,* 111 F.3d at 177.

Under the APA, the agency's role is to resolve factual issues to arrive at a decision that is supported by the **administrative record**, while "the

function of the district court is to determine whether or not as a matter of law the evidence in the **administrative record** permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS,* 753 F.2d 766, 769 (9th Cir.1985) ; *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agriculture,* 18 F.3d 1468, 1472 (9th Cir.1994) ("[T]his case involves review of a **final agency determination** under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the **administrative record**."). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the **administrative record** and otherwise consistent with the APA standard of review. *See Richards v. INS,* 554 F.2d 1173, 1177 & n. 28 (D.C.Cir.1977), *cited in Bloch v. Powell,* 227 F.Supp.2d 25, 31 (D.D.C.2002), *aff'd* , 348 F.3d 1060 (D.C.Cir.2003).

The bulk of Plaintiff's argument before this Court is dedicated to highlighting numerous factual and legal arguments in the **administrative record** presented to the ABCMR, that the ABCMR's decision failed to resolve.

Army Regulation 15–185 provides Department of the Army policy, criteria, and **administrative** instructions regarding an applicant's request for the correction of a military record. The ABCMR operates pursuant to law (10 USC 1552) within the Office of the Secretary of the Army and is the **highest level of administrative review** within the Department of the Army with the mission to correct errors in or remove injustices from **Army military records** and decides cases on the **evidence of record**. It is not an investigative body.

The Official Military Personnel File (OMPF) is primarily an **administrative record**, containing information about the subject's service history such as: date and type of enlistment/appointment; duty stations and assignments; training, qualifications, performance; awards and decorations received; disciplinary actions; insurance; emergency data; administrative remarks; date and type of separation/discharge/retirement (including DD Form 214, Report of Separation, or equivalent); and other personnel actions.

There were numerous relevant and pertinent documents/**evidence** in the **administrative record**, my **Official Military Personnel File (OMPF)** during the proceedings of the Army Board For Correction of Military Records (ABCMR) that were deliberately omitted and not considered for review.

These deliberate omissions of pertinent and relative documents/evidence in the **administrative record**, my OMPF, created a false narrative, false justification, and false authorization for a General Discharge, under Honorable Conditions, on my corrected DD Form 214, under the Special Additional Information in section 25, Separation Authority AR 635-200, Chapter 10, and in section 28, Narrative Reason for Separation, For the Good of the Service in Lieu of Court Martial.

1. Two of the pertinent and relevant documents/evidence (DA Form 3975) from my OMPF dated **7 Apr 1986** shows at **0950 AM** I voluntarily turned myself in to the Military Police, (MPs) at Ft. Belvoir, Virginia.

   **iiFootnote: See DA Form 3975 below.**

2. Another pertinent document/evidence (DA Form 3881) in my OMPF dated **7 Apr 1986** at **1020 AM**, is called "Rights Warning Procedure/Waiver Certificate." In the section at the bottom of this form called "Non-Waiver" I checked the box with an "X" where it was written I do not want to give up my rights, I want a lawyer. Immediately below this is my signature and in all upper-case letters is the statement, "ATTACH THIS WAIVER CERTIFICATE TO ANY **SWORN**

**STATEMENT** (DA FORM 2823) SUBSEQUENTLY EXECUTED BY THE SUBJECT SUSPECT/ACCUSED".

### iii Footnote: See Rights Warning Procedure Certificate below.

**3.** On the reverse side of **DA Form 3881**, dated **7 Apr 1986 at 1020 AM**, at the top, is Section B, Rights Warning Procedure. Directly below is a section identified as "The Waiver". On the left-hand side of, "The Waiver" is the following statement. "Do you want a lawyer now?" (If the suspect/accused says "**yes**" stop the questioning until he/she has a lawyer.

### iv Footnote: See reverse side of Da Form 3881 below.

**4. Two more critical documents/evidence in my OMPF is a two page Sworn Statement on DA Form 2823 dated 7 Apr 1986** at **1905.** This Sworn Statement on DA Form 2823 was taken from me without the advice or consent of counsel, after stating in writing 12 hours before this I wanted a lawyer.

### v Footnote: See two-page Sworn Statement below.

**5.** Being totally exhausted, to include suffering from jetlag, the Military Police took this **SWORN STATEMENT** from me on **7 Apr 1986 at 1905**, using **DA Form 2823**, without attaching the Waiver Certificate, DA Form 3881, that states in writing I wanted a lawyer. In this Sworn Statement on DA Form 2823 I stated that I wanted to renounce my United States citizenship after being repeatedly interrogated and threatened for 12 hours that I would be returned by hook or crook in hand cuffs and shackles to Greece. Considering what was going on in the world and at my military unit I thought it was a matter of time before a nuclear round was stolen from the 70th USAFAD because of all the gross violations of TS SCI material.

**6.** Before the **SWORN STATEMENT** on **7 Apr 1986,** I repeatedly told the Military Investigators that I worked in a Nuclear Duty Position in Greece and that there were many serious Top Secret security violations of SCI material at the 70th USAFAD and that I had already written down and reported these violations to my immediate commander Cpt. Eccleston in his office and after telling me F--- You, he threw all the papers in the floor and told me pick them up and to get out. As I was leaving his office Cpt. Eccleston called the Commander of the 558th Artillery Group in Athens Greece, our higher headquarters and told him about these security violations that I had reported to him. Captain Eccleston the Commander

of the 70th USAFAD and the Colonel of the 558th Artillery Group failed to address these security violations and compromises of TS SCI material for several months and that is why finally I had gone AWOL on April 4, 1986, to report these security violations to the Pentagon. In fact, Cpt. Eccleston, and the Commander of the 558th Artillery Group had the statutory duty under military law to report these violations of the **"Loss of Two Man Control"** over the "Nuclear Artillery Rounds" at the 70th USAFAD on a -6 Report to the Chairman of the Joint Chiefs of Staff at the Pentagon but failed to do so. That is the reason I told the Military Police that I didn't want to return to Greece because of the numerous uncorrected security violations in my unit, the 70th USAFAD, and **I asked them to please reassign me stateside so I could finish my enlistment**.

> vi **Footnote: A copy of a letter made by VARMC, St. Louis from a record in VA's Possession from my father, James R. Meade. "Next we went to the Hoffman Building and was told by the Colonel that they were going to let Michael have a stateside assignment. This never happened.**

> I told the MP's that if this was the way that the U.S. Army allowed its Commanders to maintain nuclear weapons that I felt it was a matter of time before a Nuclear Round was stolen and under no circumstances would I be a part of this because I took my oath to protect and defend the national security of the United States very serious.

**7.** Another pertinent document/evidence in my OMPF that further establishes the 12-hour timeline is DA Form 629, Receipt For Prisoner Or Detained Person signed by 2LT Charles C. Collins, dated **April 7, 1986 at 1950 hours.**

> vii **Footnote: See Receipt for prisoner below.**

**8.** The next pertinent document/evidence in my OMPF were **Orders 62-5** dated 30 Apr 1986 for a Permanent Change of Station (PCS) to Ft. Dix, New Jersey that were authorized by **DA Message dtd 081230Z Apr 86 _(08 Apr 1986 at 1230Z)_** from the Department of the Army, Headquarters 558th United States Army Artillery Group (USAAG), APO New York 09253 Orders 62-5 assigning me to Ft. Dix New Jersey.

> viii **Footnote: See Orders 62-5 below.**

**9.** Per the Additional Instructions of Orders 62-5, section (f) the Service member must contact the Military Airlift Command terminal at least 30 days prior to **availability date (30 Apr 1986)** to arrange for flight reservation. Below the additional instructions on Orders 62-5 on the left-side is a section, "**For Army Use**" and on the right-side as you follow it down are the words **Aval Date** 30 Apr 1986. Pointing out the additional instructions in section (f) above is to demonstrate that the "Reporting" and "Availability" date of **Orders** 62-5 is **30 Apr 1986,** but the actual date of the "Orders" is **08 Apr 1986** to fulfill all the requirements prior to departure.

**10.**     Another pertinent document/evidence in my OMPF is a three page SWORN STATEMENT dated **18 Apr 1986** from SFC Larry G. Harbinson on DA FORM 2823. On page one of this Sworn Statement, towards the bottom, he wrote, "***On 8 Apr 1986***, after Sgt. Meade was informed by me that he had to return to Greece... he requested to see trial defense... At his request, ***Meade was transported to SJA where he obtained legal counsel, Cpt. Bucella***.

**11.**     At the bottom of page one of this Sworn Statement dated **18 Apr 1986** by SFC Harbinson he writes, "During a conversation with Meade, he related that he wanted to renounce his American Citizenship. Due to his security clearance MI (Cpt Solich) was contacted and responded". Continuing at the top of page two of his Sworn Statement SFC Harbinson states, "Meade was debriefed by Cpt. Solich for three consecutive days".

> ix **Footnote: Violations of Top- Secret SCI Material (Sensitive Compartmented Information) in Greece.**
>
> **These top-secret security violations were brought to the attention and acknowledged by the U.S. Army Inspecting General's Office at the Pentagon.**
>
> **Per hearing notes Colonel Price from IG verified the violations in Greece prior to his AWOL and used this in his Defense.**
>
> x **Footnote: A copy of a letter made by VARMC, St. Louis from a record in VA's Possession letter from the Department of the Army, Office of the Inspecting General, Lieutenant General Ronald Griffith denying my request for records. "The Army Inspecting General has no records as you describe. Under current law, a no records response can be interpreted as a denial".**

9

I was debriefed for three consecutive days *(8 Apr -10 Apr 1986)* by Cpt. Solich of the Military Intelligence and my military clearance was taken and I was told that I was DFR'd (Dropped from the Rolls of my Unit and no longer assigned to the 70th USAFAD) because I no longer had access to classified material.

**xi Footnote: A copy of a letter made by VARMC, St. Louis from a record in VA's Possession from my father, James R. Meade. Then we were told at Ft. Belvoir, Virginia by Lt. Donohue to purchase a uniform so Michael could return to Greece. Next thing happened we were called by Lt. Donohue that Michael was dropped from the roll in Greece and could not return.**

After being debriefed by Captain Solich he had me sign a Non-Disclosure Agreement where I couldn't discuss classified information about what had happened in Greece without a person with a proper security clearance and the need to know.

Continuing page two of his Sworn Statement SFC Harbinson states, "After his debriefing from MI, Meade again requested to see his lawyer, when he was ordered by Lt. Donohue to sign his transportation request and get on the flight arranged for him. This occurred on *11 Apr 1986*.

12.     Continuing page two of his Sworn Statement dated 18 Apr 1986, SFC Harbinson, the Military Police Investigator at Ft. Belvoir, VA. States, "that on *11 Apr 1986* CPT Bucella requested that Meade undergo a mental evaluation because he had delusional thoughts, to include wanting to renounce his U.S. Citizenship. Further, she related that "she couldn't talk to Meade because of his clearance and that she was referring him to Cpt. O' Bryan on **14 Apr 1986**. Meade's Port Call **(14 Apr 1986)** was then cancelled".

**xii Footnote: See three page Sworn Statement by SFC Harbinson below.**

13.     Another pertinent document/evidence in my OMPF is a written letter from my **legal counsel** Cpt. Bucella dated *April 11, 1986,* thru the Provost Marshall at Ft Belvoir, VA, the Office of the Staff Judge Advocate and to the Commander, United States Center and Fort Belvoir, Ft. Belvoir, Virginia.

In paragraph 3 of this letter dated ***April 11, 1986***, Cpt. Bucella wrote, "This is an **additionally unusual case, since I am unable to speak with Sgt. Meade, in that I do not have a clearance**. Cpt. O'Bryan, SDC, Fort Belvoir, will be able to advise him as to his status when she returns on Monday" **(14 Apr 1986).** After my (Cpt. Bucella) conversation with **Military Intelligence** (Don Bator), I believe, for his sake, **Sgt. Meade must speak with an attorney who has clearance**. I am unable to provide any more information, as we had a difficulty in exchanging information **because he cannot speak to me about the issue at hand**".

xiii **Footnote: Written letter from Captain Bucella thru Provost Marshall.**

**14.**    I never met with Cpt. Bucella after Friday, ***11 Apr 1986*** because she withdrew from the case without ever informing me either verbally or in writing. On Monday, ***14 Apr 86*** I never met with Cpt. O'Bryan with a Security Clearance where I could discuss the security issues at hand in my unit, the 70th USAFAD, which I still contend was the reason I had gone AWOL in the first place because nobody would address these very serious concerns for National Security.

**15.**    On page two, quarter of the way down of his Sworn Statement dated 18 Apr 1986, SFC Harbinson, the Military Police Investigator at Ft. Belvoir, VA. States, "On Monday, ***14 Apr 1986***, Meade was taken to Dewitt Army Hospital for mental evaluation. He was declared fit for duty and released to the MP's.

**April 14, 1986,** I was seen by the U.S. Army psychiatrist at Ft. Belvoir, VA who stated, "While his request to terminate his citizenship (referencing my April 7, 1986, Sworn Statement to the military police requesting to terminate citizenship) was described as unusual, no thought disorder was found. In fact, given his stated goal, his thoughts and ideas were described as "well organized and logical". There was no evidence of any past treatment for any psychiatric complaints. No psychiatric disorder was identified.

The facts bear out that when I met with the Army Psychiatrist on **April 14, 1986**, I had several mental health issues that was presented to him while evaluating me. One mental health issue in the form of a **Sworn Statement** right there in front of him stating I wanted to renounce my U.S. Citizenship (which he acknowledged and cited in his diagnosis) that I made a week earlier on **April 7, 1986**.

I was a 25-year-old recently married Sergeant with seven years in the military on a hardship tour in Northern Greece without any disciplinary problems who got drunk in the bar, cursed out the commander, went AWOL to the United States and stated he wanted to renounce his U.S. Citizenship.

xivFootnote: See more details below.

**16.**     On page two, quarter of the way down of his Sworn Statement dated 18 Apr 1986, SFC Harbinson, the Military Police Investigator at Ft. Belvoir, VA. States, during this time frame, calls were made to JA, MPOA, AG, Finance and Transportation to determine Meade's disposition. **JAG also contacted MILPERCEN for possible reassignment instructions (J**udge Advocate General**).** I was informed my AG (CW2 Willis) that Meade would not be reassigned and would be returned to Greece. During the week of *14-18 Apr 1986*, every effort was made and exhausted to get a final disposition on Meade. It was finally determined that he would be returned to Greece under escort, since he continuously stated that he would not return and was now considered a "Flight" risk.

**17.**     At the top of page one of his Sworn Statement dated *18 Apr 1986*, SFC Harbinson, the Military Police Investigator at Ft. Belvoir, VA. States, "At approximately 1551 hours, 18 Apr 1986, I witnessed Sgt. Michael R. Meade, 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, fail to obey a lawful order to sign a DD Form 460, Provisional Pass, -- an Order he was verbally given by 1LT David F. Donohue, MP Operations Officer, Ft. Belvoir.

> On *18 Apr 1986* at 1636 I, then Sgt. Meade was arrested at Ft. Belvoir, VA for failing to follow an Order to sign a Provisional Pass and put in the D-Cell at the MP Station awaiting transportation to Ft. Dix, New Jersey for confinement the following day, 19 Apr 1986.

> I, Michael R. Meade contend that this was an unlawful "Order" given on **18 Apr 1986** by Lt. Donahue because **I was never afforded proper and effective legal counsel with a security clearance since I arrived at Ft. Belvoir, VA on 7 Apr 1986** as requested by my Defense Counsel Cpt. Bucella on *11 Apr 1986*. Additionally, I was dropped from the rolls of my unit (DFR'd) in Greece, and my required security clearance to do my job was terminated by Cpt. Solich, after three days of debriefing.

**I was A whistleblower,** (Also written as **whistle-blower** or **whistle blower**) a person who exposes any kind of information or activity that is deemed illegal, unethical, or not correct within an organization that is either private or public. The information of alleged wrongdoing can be classified in many ways: violation of company policy/rules, law, regulation, or threat to public interest/**national security**, as well as fraud, and corruption.

The Order given to me on _**18 Apr 1986**_ by Lt. Donahue to sign the provisional pass to return to my unit in Greece was to bring additional charges against me because being AWOL for three days would not constitute the severity to have me reassigned to the Personnel Control Facility at Ft. Dix New Jersey per the existing Army Regulations, AR 635-200, Chapter 10. The Order to return to Greece was given to me by Lt. Donohue on 18 Apr 1986 because it carried the severity of charges required by a Court Martial which could bring about a Bad Conduct or Dishonorable Discharge in lieu of requesting a discharge for the good of the service.

18. Another pertinent document/evidence in my OMPF is Orders 126-76 dated **6 May 1986,** with an effective date of,_**19 Apr 1986**_, from the U.S. Army Training Center and Fort Dix, Fort Dix, New Jersey 08640-7225 **attaching** (**not confining**) Sgt. Meade, Michael R. 214907204, of the 70th USAFAD (**WA39AA**) APO Ny 09693 to Co. A, US Army Personnel Control Facility Ft Dix, New Jersey 08640-7225. At the bottom of these Orders 126-76 under Purpose, it states the following: _**Pending Reassignment Orders**_ from your parent unit. Further down on Orders 126-76 under the additional instructions of subparagraph c it states: Attachment authorized by **HQDA (DAPE-HRE)** _**Mr. Dolbow**_ **pending reassignment Orders**. **H**ead**Q**uarters **D**epartment of the **A**rmy (**D**epartment of the **A**rmy **P**ersonnel-**HRE**=**H**uman **R**esources**)**

xv **Footnote: See Orders 126-76 below.**

Go back and look at **Orders 62-5** dated **30 Apr 1986** for a Permanent Change of Station (PCS) to Ft. Dix, New Jersey that were authorized by **DA Message dtd 081230Z Apr 86 _(08 Apr 1986 at 1230Z)_** from the Department of the Army (DA), Headquarters 558th United States Army Artillery Group (USAAG), APO New York 09253 **assigning** me to Ft. Dix New Jersey.

Go back to page two, quarter of the way down of his Sworn Statement dated **18 Apr 1986**, SFC Harbinson, the Military Police Investigator at Ft. Belvoir, VA States, "During this time frame, calls were made to JA, MPOA, AG, Finance and Transportation to determine Meade's

disposition. **AG also contacted MILPERCEN for possible reassignment instructions.** I was informed my AG (CW2 Willis) that Meade ***would not be reassigned*** and would be returned to Greece".

19. For approximately three weeks from ***19 Apr 1986 thru 06 May 1986*** I Sgt. Michael R. Meade ***was not assigned but confined*** to the Personnel Control Facility at Ft. Dix, New Jersey without conferring with any legal counsel, with or without a security clearance. (At this point I had been ***without any counsel, including effective legal counsel*** for approximately one month, beginning with the day I arrived at Ft. Belvoir VA on ***7 April 1986 to 6 May 1986***.)

While **confined** at the Personnel Control Facility (PCF) I was issued and forced to wear a Helmet Liner and an outdated Olive Drab uniform (pants and shirt) no longer worn or issued by the U.S. Army at the time. I was not allowed to wear my insignia for the rank of Sergeant or a name tag to identify myself. I was forced to wear boots issued by the PCF that had been worn by others and they had not been polished for months and consequently had turned white and I was not allowed to polish these boots. I was forced to march to various points on the base in this uniform to include the Dining Facility where Army soldiers from other units were present and seen me. As a Sergeant, I felt totally humiliated having to dress like this and additionally I was not treated as an NCO or a supervisor instead I was ordered to do the work as an enlisted member such as cutting grass, sweeping, mopping floors, and picking up cigarette butts off the ground to include having to walk in front of the EOD personnel in tall grass on one of the ranges to identify dud rounds, unexploded ordinances. For those three weeks of confinement from 19 Apr 1986 thru 06 May 1986 I Sgt. Michael R. Meade was not treated as an NCO instead I was quartered and bunked in the same open living space with approximately twenty men who had been Deserters from the U.S. Army for months and in many cases for years. What the U.S. Army did was a ***"Constructive Dismissal".***

(In employment law, **constructive dismissal**, also called **constructive discharge** or **constructive termination**, occurs when an employee resigns as a result of the employer creating a hostile work environment. Since the resignation was not truly voluntary, it is in effect, a termination. For example, when an employer makes life extremely difficult for an employee, to attempt to have the employee resign, rather than outright firing the employee, the employer is trying to affect a constructive discharge).

**20.**    Two more pertinent documents in my OMPF are identified as, "Request For Discharge For The Good Of The Service dated **_06 May 1986_**; this was the first and last time I met with Captain John K. Hutson, my Defense Counsel, only for approximately five minutes, when he told me to sign the document. **AR 635-200,10-2a Servicemember was not given 72 hours to consult with counsel to consider the wisdom of submitting a request for discharge.**

> xvi **Footnote: See Request For Discharge For The Good Of The Service signed by Defense Counsel on 6 May 1986.**

> **I was never afforded proper and or effective legal counsel to include an attorney with a security clearance since I arrived at Ft. Belvoir, VA on 7 Apr 1986** as requested by my Defense Counsel Cpt. Bucella on **_11 Apr 1986_**. "After my (Cpt. Bucella) conversation with **Military Intelligence** (Don Bator), I believe, for his sake, **Sgt. Meade must speak with an attorney who has clearance.** I am unable to provide any more information, as we had a difficulty in exchanging information **because he cannot speak to me about the issue at hand**".

**21.**    Continuing in the second section below this Request for Discharge For The Good Of The Service identified on the left with the number 1, "I, Sgt. Michael R. Meade, SSN 214907204, hereby, voluntarily request discharge for the good of the service under the provisions of **AR 635-200, Chapter 10**. I understand that I may request discharge for the good of the service because of the following charge(s) which has (have) been **preferred** against me under the UCMJ.

> I, Michael R. Meade signed this "Request for Discharge For The Good Of The Service" (on the back of this form) on **_06 May 1986_** without any charges being **preferred** against me.

> Underneath of my signature on this same "Request For Discharge For The Good Of The Service" is the signature of Captain John K. Hutson, my Defense Counsel, with a date of **_06 May 1986_** thereby proving in writing, without any doubt, ineffective assistance of counsel.

**22.**    Another pertinent document in my OMPF is dated **07 May 1986** (with another stamped date of 12 May 1986 two lines from the top) with the Subject: Request For Discharge For The Good Of The Service, Chapter 10.  LTC. Steven W. Magner signed this document stating he **personally reviewed** the enclosed

Request for Discharge for the Good of the Service of Sgt. Michael R. Meade, 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 and approved the request for an "Other Than Honorable" Discharge.

xvii **Footnote: Request For Discharge signed by LTC. Steven W. Magner failed to review; Charge Sheet, and no counsel.**

In accordance with AR 635-200 Chapter 10-3b the discharge was not properly reviewed by the staff judge advocate prior to the approval of the separation authority as specified in paragraph 1-21c(5) and I-21I.

23.   Two more pertinent documents/evidence in my OMPF is identified as, "Charge Sheet" dated ***08 May 1986***, two days (**48 hours**) after I signed the Request For Discharge For The Good Of The Service on **06 May 1986**.

In accordance with **AR 635-200 Chapter 10-1a**, a Request for Discharge for the Good of the Service may be submitted after court-martial charges are **preferred** against the member.

xviii **Footnote: Charge Sheet.**

In Section "3" of this, Charge Sheet" are the words "Nature of restraint of accused". Below this are the words, "Restricted to PCF". In section "9" are the words "Date(s) Imposed. Below this is the date, "19 Apr 1986".

Directly below this date of 19 Apr 1986 on the "Charge Sheet" is section "II Charges And Specifications".

Directly below section "II" of this "Charge Sheet" on the left-hand side is the number "10", and to the right are the words, Charge: I, Violation of the UCMJ, Article 86. Below this is the word "Specification" ... AWOL from his unit in Greece starting on April 4, to when he voluntarily turned himself in at Ft. Belvoir, VA to the Military Police on April 7, 1986.

Charge: II, Violation of the UCMJ, Article 90. Below this is the word "Specification" ... Failure to sign a provisional pass to return to Greece given by 1LT Donohue on 18 Apr 1986 at Ft. Belvoir, Virginia.

Directly below the "Charges" is section III, ***Preferral***. In section 11a are the words, "Name of Accuser", Bean, Rogers, L, with his signature directly below it in section d. To the right of his signature is section e, Date, ***08 May 1986***.

Directly below section III is an Affidavit signed on ***8 May 1986***, by Cpt. Daniel Manning, Judge Advocate. This Affidavit signed by Lt. Daniel Manning of the **Judge Advocate** attested that the above-named accuser, Lt. Rogers L. Bean personally appeared before him on ***08 May 1986*** and signed the foregoing charges and specifications under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

Directly below the Affidavit is section 12 where it is written ***that on 8 May 1986 the accused was informed of the charges against him***/her and the names of the accuser(s) known to me signed by 1LT. Rogers L. Bean.

Directly below the signed Affidavit is section IV Receipt By Summary Court Martial Convening Authority.13 The Charges were received on **20 May 1986** at HQ's, Headquarters Command, USATC&FD FT Dix NJ 08640, Signed by the Adjutant, First Lieutenant Theodore Haines, For the Commander.

**07 May 1986** (with another stamped date of **12 May 1986** two lines from the top) Subject: Request For Discharge For The Good Of The Service, Chapter 10. LTC. Steven W. Magner signed this document stating he **personally reviewed** the enclosed Request for Discharge for the Good of the Service of Sgt. Michael R. Meade, 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 and approved the request for an "Other Than Honorable" Discharge.)

**24.**    Another pertinent document in my OMPF is Orders 163-81 dated 12 June 1986, signed by Rogers L. Bean, 1LT, MP, Asst Adjutant, reducing me from SGT to PVT1, with an effective date of **12 May 1986,** 10 days before the Separation Authority, Major General Thomas W. Kelly, Commander, Ft. Dix New Jersey reviewed the request for discharge for the good of the service, reducing me to PVT E-1 and authorizing an Other Than Honorable Discharge.

<sup>xix</sup> **Footnote: Orders 163-81**

**25.**     Another pertinent document in my OMPF is dated **23 May 1986,** from Major General Thomas W. Kelly, Commander, Ft. Dix, New Jersey, who signed a statement that he **personally** reviewed the request for discharge for the good of the service of Sgt. Michael R. Meade, 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, Co A, US Army Personnel Control Facility, Ft. Dix, New Jersey and **authorized** an "Other Than Honorable" Discharge. The request was approved and I, Michael R. Meade was issued an "Other Than Honorable" Discharge Certificate and reduced to the lowest enlisted grade.

> <sup>xx</sup> **Footnote: Major General Thomas W. Kelly signed The Request for Discharge.**
>
> The Request for Discharge, the Charge Sheet and a complete copy of all reports of investigation was forwarded to the separation authority, Major General Thomas W. Kelly, Commander at Ft. Dix, New Jersey ***prior to his review***, in accordance with AR 635-200 Chapter 10-3b,c(1) (3) and Chapter 10-10.
>
> It was a "**Wrongful Dismissal**" and arbitrary and capricious for the U.S. Army to discharge me by not following their own termination procedures as outlined in their own promulgated rules and regulations which was in retaliation for being a **whistleblower**.
>
> (**Wrongful dismissal**, also called **wrongful termination** or **wrongful discharge**, is a legal phrase, describing a situation in which an employee's contract of employment has been terminated by the employer if the termination breaches one or more terms of the contract of employment, or a statute provision in employment law. It follows that the scope for wrongful dismissal varies according to the terms of the employment contract and varies by jurisdiction. The absence of a formal contract of employment does not preclude wrongful dismissal in jurisdictions in which a *de facto* contract is taken to exist by virtue of the employment relationship. Terms of such a contract may include obligations and rights outlined in an employee handbook. Being terminated for any of the items listed below may constitute wrongful termination:

Employer is not following own termination procedures: Often, the employee handbook or company policy outlines a procedure that must be followed before an employee is terminated. If the employer fires an employee without following this procedure, the employee may have a claim for wrongful termination.

On **June 30, 1986**, I suffered with severe depression after being illegally discharged with an OTH Discharge at Ft. Dix, New Jersey that has led to me being homeless for years unable to maintain gainful employment while being targeted by the FBI as a terrorist and for espionage, to include telling my then Navy Jewish wife I was a white supremacist and a traitor. I sought help from the State of Maryland for food stamps and medical assistance and was told I was not eligible because of my OTH Discharge.

Because of the Other Than Honorable Discharge I was not eligible for any VA Benefits, to include being treated at the VA Hospital for any medical conditions, like the severe Depression I have been suffering from.

In **July of 1986** it just seemed like my situation went further downhill when the government was trying to antagonize and harass me by sending my U.S. Army DD Form 214 discharge papers with coffee stains and cigarette ashes on them.

I was depressed even further when I went to the unemployment office in St. Mary's County, Leonardtown, Maryland and was denied unemployment benefits, Food Stamps, Cash assistance and Medical assistance.

I knew the decision to deny my benefits came from the federal government after the unemployment office in Leonardtown, Maryland (St. Mary's County) called the office in charge of federal unemployment in Baltimore, Maryland and they told her not to give me any benefits at all.

It was upsetting that in such a short time after my discharge in July of 1986 that I could not find gainful employment and had to move in with my parents. When I returned to Maryland and was living there I could not get any help to get back on my feet and I received absolutely no help from the City, County, State, or Federal Government. A few weeks later my marriage ended after my wife, who was then serving in the U.S. Navy was told by the FBI that I was a traitor to my county. It was very numbing, to say the least, when I never saw my wife again after I returned from Greece in April of 1986, so I could at least bring closure to that chapter in my life.

After this Illegal OTH Discharge I was severely depressed because I had to move in with my parents and had no steady money coming in as my military career ended abruptly and I was unable to find employment. Having only worked for the U.S. Army my entire life I had no marketable skills that transferred over to the civilian world. On top of that I could not provide any character references to potential employers as all my contacts were in the military or to explain about my Other Than Honorable Discharge as the information was Classified Secret for National Security. I signed a Non-Disclosure Form under penalties of being prosecuted and imprisoned after being debriefed by the Military Intelligence at Ft. Belvoir, VA in April of 1986.

These numerous deliberate omissions of relevant and pertinent

**documents/evidence** contained in my Official Military Personnel

File (OMPF) that were not reviewed allowed the Army Discharge

Review Board (ADRB) on **May 6, 1987**, to create a false narrative,

false justification, and false authorization for my Other Than

Honorable Discharge on my DD Form 214 under the Special

Additional Information in section 25, Separation Authority AR 635-

200, Chapter 10, and in section 28, Narrative Reason for Separation, For the Good of the Service in Lieu of Court Martial.

These numerous deliberate omissions of relevant and pertinent **documents/evidence** contained in my **Official Military Personnel File (OMPF)** that were not reviewed allowed the Army Board for Correction of Military Records (ABCMR) on **19 July 1989** (**AC89-05813E**), to continue that false narrative, false justification, and false authorization on my corrected DD Form 214 under the Special Additional Information in section 25, Separation Authority AR 635-200, Chapter 10, and in section 28, Narrative Reason for Separation, For the Good of the Service in Lieu of Court Martial.

The ABCMR in numerous decisions from 1991 thru 1993, refused to even reconsider my Other Than Honorable Discharge citing ABCMR decision dated **19 July 1989**, case **AC89-05813**.

In 1993/1994 I appealed the **Boards** decision to the United States District Court, Middle District of Florida, Orlando, Division, Case 93-1010-CIV-ORL-19 and 94-949-CIV-ORL-19. Judge Patricia Fawsett,

per the **Boards** narrative, concluded, that based upon the

**evidence**/documents of record and allegations raised by the

applicant, both the ADRB and the ABCMR decisions were reasonable.

There were no findings that these decisions were arbitrary,

capricious, or contrary to law. The court, per the **Board's** narrative

further held that the Army had made an adequate search an attempt

to locate the alleged records or documents/**evidence** that the

applicant contended the Army should have used in the adjudication of

his case. Judge Patricia Fawsett determined that the issue of

**ineffective counsel** had not been previously raised to the Board. It

opined that the applicant may have had a "**colorable ineffective**

**assistance of counsel claim**" but that the proper forum of this

would be the Correction Board as a reconsideration.


Judge Paul Gregory Byron, then assistant U.S. Attorney was assigned

to Case 93-1010-CIV-ORL-19 and 94-949-CIV-ORL-19 and obtained

a complete official copy of my Official Military Personnel File

(OMPF). Judge Paul Byron began his career as a Judge Advocate in

the Judge Advocate General's (**JAG**) Corps of the United States Army

from 1986 to 1990 and was well versed in military law. From 1991 to

2001, he served as an Assistant United States Attorney in the Middle District of Florida.

On **April 29, 1998,** the ABCMR reconsidered my appeal **AC89-05813E** from **19 July 1989**. This appeal was considered the final administrative action taken by the Secretary of the Army.

On page one at the bottom of this **Memorandum of Consideration** dated **April 29, 1998,** citing ABCMR Document Number **AC89-05813E** it states, "The Board Considered the following **evidence**: Exhibit B- "***Military Personnel Records***".

All of the Exhibits I cited about **ineffective counsel** are not any new **evidence**/documents but have been there the entire time and come directly from my **Official Military Personnel File (OMPF)** from when I turned myself into the Military Police at Ft. Belvoir, Virginia on **7 Apr 1986** continuing to **19 Apr 1986** and **evidence**/documents from my same **Official Military Personnel File (OMPF) Personnel Records** from Ft. Dix, New Jersey

between **19 Apr 1986** until I was discharged on **30 May 1986** that the ADRB and the ABCMR **"Boards"** have refused to consider or review.

The **"Boards"** established pursuant to authority contained in **10 U.S. C. 1552** and in accordance with Army Regulation **15-185** are mandated to review in accordance with the above prescribed rules and regulations my **official military personnel file (OMPF)** from when I turned myself into the Military Police at Ft. Belvoir, Virginia on **7 Apr 1986** continuing to **19 Apr 1986** and **evidence**/documents from my same **Official Military Personnel File (OMPF)** from Ft. Dix, New Jersey between **19 Apr 1986** until I was discharged on **30 May 1986**.

The **evidence**/documents contained in my **Military Personnel File** were pertinent to the corrective action to determine whether to authorize a formal hearing, recommend the records be corrected without a formal hearing, or to deny the application without a formal hearing if it has been determined that insufficient relevant

**evidence**/documents has been presented to demonstrate the existence of probable material error or injustice.

On page two, second to the last paragraph of this **Memorandum of Consideration** dated **April 29, 1998,** of ABCMR citing Document Number **AC89-05813E it** states, "He further contended that he had **ineffective counsel** at the time of his discharge and that certain important documents/**evidence** were not reviewed in the Board's consideration".

On page two, the last paragraph of this **Memorandum of Consideration** dated **April 29, 1998,** citing ABCMR Document Number **AC89-05813E it** states in pertinent part my 1993/1994 appeal of the **Boards** decision to the United States District Court, Middle District of Florida, Orlando, Division, Case 93-1010-CIV-ORL-19 and 94-949-CIV-ORL-19. Judge Fawsett, per the **Boards** narrative, concluded, that based upon the **evidence**/documents of record and allegations raised by the applicant, both the ADRB and the ABCMR decisions were reasonable. There were no findings that these decisions were arbitrary, capricious, or contrary to law. The court, per

the **Board's** narrative further held that the Army had made an adequate search an attempt to locate the alleged records or documents/**evidence** that the applicant contended the Army should have used in the adjudication of his case.

The court determined, per the **Board's** narrative, that the issue of **ineffective counsel** had not been previously raised to the Board. It opined that the applicant may have had a "**colorable ineffective assistance of counsel claim**" but that the proper forum of this would be the Correction Board as a reconsideration.

Continuing with the "**Memorandum of Consideration**" dated **April 29, 1998** of ABCMR citing Document Number AC89-05813E it goes on to state my legal counsel at Ft. Belvoir, Virginia Cpt. Donna Bucella withdrew from my case leaving me without counsel only for two weeks due to her lack of clearance although the fact is she never consulted with me about the issues  because of her lack of clearance effectively leaving me without legal counsel for an entire month, since the day I turned myself into the Military Police on **7 Apr 1986** at Ft. Belvoir, Virginia until **6 May 1986**.

On page three, midway down on the **"Memorandum of Consideration"** dated **April 29, 1998,** citing ABCMR Document Number AC89-05813E it states "Manual for Courts-Martial (MCM) lists the maximum punishment for AWOL, less than 30 days, as six months at hard labor with forfeiture of two thirds pay for six months and for willful disobedience of a commissioned officer as dishonorable discharge, five years' confinement at hard labor with total forfeiture of pay.

On page four, number 7 of the **"Memorandum of Consideration"** dated **April 29, 1998,** citing ABCMR Document Number AC89-05813E it states, "The applicant was considered a flight risk and his freedom was controlled pending disposition of the court-martial charges. During this period, he performed menial tasks normally assigned to detainees. This constitutes neither an improper action nor punishment prior to legal action".

My corrected DD Form 214 (Certificate of Release or Discharge from Active Duty) at the bottom, in sections 25 and 28, in the Special

Additional Information, is based on these same numerous deliberate omissions of relevant and pertinent documents/**evidence** that were in my Official Military Personnel File (OMPF) during the Army Board for Correction of Military Records, Record of Proceedings in my case dated 13 January 2021, Docket # 20180007621.

These same numerous omissions of relevant and pertinent documents/evidence contained in my Official Military Personnel File (OMPF) allowed the Army Board for Correction of Military Records (ABCMR) on June, 8 2021, to continue this same false narrative, false justification, and false authorization for my Discharge on my corrected DD Form 214 under the Special Additional Information in section 25, Separation Authority AR 635-200, Chapter 10, and in section 28, Narrative Reason for Separation, For the Good of the Service in Lieu of Court Martial.

**Ostracism** was a procedure under the Athenian democracy in which any citizen could be expelled from the city-state of Athens for ten years. While some instances clearly expressed popular anger at the citizen, ostracism was often used preemptively. It was used as a way of neutralizing someone thought to be a threat to the state or potential tyrant. The word "ostracism" continues to be used for various cases of social shunning.

**Shunning** can be the act of social rejection, or emotional distance.

**Social rejection** occurs when a person or group deliberately avoids association with, and habitually keeps away from an individual or group.

This can be a formal decision by a group, or a less formal group action which will spread to all members of the group as a form of solidarity. It is a sanction against association, often associated with religious groups and other tightly knit organizations and communities. Targets of shunning can include persons who have been labeled as apostates, **whistleblowers**, dissidents, strikebreakers, or anyone the group perceives as a threat or source of conflict. **Social rejection** has been established to cause **psychological damage** and has been categorized **torture**, punishment.

**Social exclusion**, or **social marginalization**, is the social disadvantage and relegation to the fringe of society. It is a term used widely in Europe and was first used in France. It is used across disciplines including education, sociology, psychology, politics, and economics.

**Social exclusion** is the process in which individuals or people are systematically blocked from (or denied full access to) various rights, opportunities and resources that are normally available to members of a different group, and which are fundamental to social integration and observance of human rights within that particular group (e.g., housing, employment, healthcare, civic engagement, democratic participation, and due process).

Anyone who appears to deviate in any way from perceived norms of a population may thereby become subject to coarse or subtle forms of social exclusion.

The outcome of **social exclusion** is that affected individuals or communities are prevented from participating fully in the economic, social, and political life of the society in which they live.

**Social stigma** is extreme disapproval of (or discontent with) a person or group based on socially characteristic grounds that are perceived, and serve to distinguish them, from other members of a society. **Stigma** may then be affixed to such a person, by the *greater* society, which differs from their cultural norms.

**Stigma** is a Greek word that in its origins referred to a type of marking or tattoo that was cut or burned into the skin of criminals, slaves, or **traitors** to visibly identify them as blemished or **morally polluted** persons. These individuals were to be avoided particularly in public places.

**Social stigmas** can occur in many different forms. Many people who have been **stigmatized**, feel as though they are transforming from a whole person to a tainted one. They feel different and devalued by others. This can happen in the workplace, educational settings, health care, the criminal justice system, and even in their own family.

**Stigma** may also be described as a label that associates a person to a set of unwanted characteristics that form a stereotype. It is also affixed. Once people identify and label your differences others will assume that is just how things are and the person will remain stigmatized until the stigmatizing attribute is undetected. A considerable amount of generalization is required to create groups, meaning that you put someone in a general group regardless of how well they actually fit into that group. However, the attributes that society selects differ according to time and place. What is considered out of place in one society could be the norm in another. When society categorizes individuals into certain groups the labeled person is subjected to status loss and discrimination. Society will start to form expectations about those groups once the cultural stereotype is secured.

**Stigma** may affect the behavior of those who are stigmatized. Those who are stereotyped often start to act in ways that their stigmatizer's expect of them. It not only changes their behavior, but it also shapes their emotions and beliefs. Members of stigmatized social groups often face prejudice that causes depression. These stigmas put a person's social identity in threatening situations, like low self-esteem.

The **stigmatized** are ostracized, devalued, rejected, scorned, and shunned. They experience discrimination and prejudice in the realms of employment and housing. Perceived prejudice and discrimination is also associated with negative physical and mental health outcomes. Those who perceive themselves to be members of a stigmatized group, whether it is obvious to those around them or not, often experience psychological distress and many view themselves contemptuously.

Wherefore the Plaintiff prays that the Court determine as a matter of law the evidence in the administrative record did not permit the ABCMR to make the decision it did, the final decision of the ABCMR was arbitrary, capricious, contrary to law, and unsupported by substantial evidence, Grant summary judgment in favor of Plaintiff, remanding the matter to the ABCMR to reassess Plaintiff's claims within the next 180 days so that it may consider and respond to all of Plaintiff's potential meritorious arguments and evidence without the presumption of regularity, the Court retain jurisdiction over this matter while the remand is pending.

I solemnly affirm under the penalties of perjury that all the foregoing statements are true and honest to the best of my knowledge and belief.

P.O. Box 5404
Winter Park, FL
32793
(407) 692-4396

Feb 11, 2022
Original

**Michael R. Meade**

<sup>i</sup> DEPARTMENT OF THE ARMY ARMY BOARD FOR CORRECTION OF MILITARY
RECORDS 251 18TH STREET SOUTH, SUITE 385 ARLINGTON, VA 22202-3531

June 08, 2021, AR20180007621, Meade, Michael R.

6/9/2021 X Joseph P. Lister Executive Officer, ARBA Signed by: LISTER. JOSEPH.
PATRICK. 1164786028

Mr. Michael R. Meade P O Box 5404 Winter Park FL 32793-5404

Dear Mr. Meade:

The Army Board for Correction of Military Records rendered a decision on your
application to correct your military records. Partial relief to your request was granted.
Enclosed is a copy of the Record of Proceedings of the Board for your information.

The decision in your case is final. You may request reconsideration of that portion of
your application which was denied by the Board only if you can present new evidence or
argument that was not considered by the Board when it denied that part of your original
application. The approved Record of Proceedings has been forwarded to the Army
Review Boards Agency Case Management Division. They will take action to correct your
records and will provide you with official notification as soon as the directed correction
has been made. However, due to the large number of cases in process, please be advised
that it may be several months before corrections are completed.

ARMY BOARD FOR CORRECTION OF MILITARY RECORDS RECORD OF
PROCEEDINGS 2

IN THE CASE OF: Meade, Michael R. BOARD DATE: 13 January 2021 DOCKET
NUMBER: AR20180007621

APPLICANT REQUESTS: in effect, a reconsideration for an upgrade of his discharge
from other than honorable to an honorable and a personal appearance before the Board

APPLICANT'S SUPPORTING DOCUMENTS CONSIDERED BY THE BOARD: • DD
Form 149 (Application for Correction of Military Record) • Memorandum for

Secretaries of the Military Departments • Physician's Report • Department of Veterans Affairs Appeal Decision • A packet of additional documents

FACTS: 1. Incorporated herein by reference are military records which were summarized in the previous consideration of the applicant's case by the Army Board for Correction of Military Records (ABCMR) in Docket Number AC89-05813 on 19 July 1989, AR1998014023 on 15 November 1999, AR20070003539 on 5 July 2007, and AR20150009716 on 10 May 2016. His request was denied.

3. The applicant states the report dated 9 April 2018 from Dr. B---- V----, clinical psychologist stated that there is clear evidence that he suffered from major depression while in service. He also had physical injuries while in service. He relates being treated unprofessionally and being targeted unjustifiably while in the military. He relates that his behavior, due to the above events and what was covered in this report, caused his other than honorable discharge.

4. The applicant provides:

 a. Memorandum for Secretaries of the Military Departments, dated 25 August 2017 which states the clarifying guidance to military discharge review Boards for correction of military/Naval records considering request by veterans for modification of their discharge due to mental health conditions, sexual assault or sexual harassment.

ABCMR Record of Proceedings (cont) AR20180007621 2

b. A letter from Dr. B---- V----, Ph.D, dated 9 April 2018, which states in his opinion the applicant fits the criteria for a major depressive disorder. c. Veteran Administration Appeal Decision dated 5 February 1999, which denied the applicant's request for VA benefits. d. Additional documents which the applicant feels supports his request for a discharge upgrade.

5. A review of the applicant's service record shows:

a. He enlisted in the U. S. Army Reserve (USAR) on 21 February 1979. He served both in the USAR and on active duty and was honorably discharged on 30 July 1983. His DD Form 214 (Certificate of Release or Discharge from Active Duty) shows he completed 4 years of net active service this period.

b. On 28 March 1984, he reenlisted for 3 years. His options were for continuation of service in the radio field, airborne training and assignment to Special Forces. He completed airborne training, did not qualify for Special Forces, but was assigned to Fort Bragg, North Carolina.

c. On 5 September 1985, he was assigned to Greece. He departed Greece on 4 April 1986 in an Absent Without Leave (AWOL) status.

d. On 7 April 1986, he turned himself in to military authorities at Fort Belvoir, Virginia. He stated at that time he would not return to Greece, and he wanted to renounce his United States citizenship in Great Britain or Italy. He later wrote that there were many security violations in his unit in Greece and the unit commander would not correct these problem areas. He saw legal counsel at Fort Belvoir, was medically and psychiatrically cleared for administrative action, and was ordered by a commissioned officer to return to his unit in Greece. He refused this order.

e. He was transferred to Fort Dix, New Jersey and on 19 April 1986, court-martial charges were preferred against him. His DD Form 458 (Charge Sheet) shows he was charged with: • one specification of absenting himself from his unit without authority on or about 4 April 1986 until on or about 7 April 1986 • one specification of willfully disobeying a lawful command from a commissioned officer to sign a Defense Form 460 (Provisional Pass) on or about 18 April 1986

ABCMR Record of Proceedings (cont) AR20180007621 3

f. On 6 May 1986, he consulted with legal counsel and subsequently requested discharge under the provisions of Army Regulation (AR) 635-200 (Personnel Separations – Enlisted Personnel), chapter 10 in lieu of trial by courts-martial. He acknowledged: • he is guilty of the charges against him or of lesser included offenses

• he did not desire further rehabilitation

• he does not desire to perform further military service

• maximum punishment if found guilty

• he understood that if his request for discharge was accepted he could be discharged under other than honorable conditions and furnished an under other than honorable discharge certificate

• he has been advised and understands the possible effect of an Under Other Than Honorable Discharge

• he would be deprived of many or all Army benefits

• he may be ineligible for many or all benefits administered by the Veterans Administration • he may be deprived of his rights and benefits as a veteran under both Federal and State law

• he may expect to encounter substantial prejudice in civilian life because of an other than honorable conditions discharge

• there is no automatic upgrading

• he may apply to the Army Discharge Review Board or the Army Board for Correction of Military Records for review of his discharge

g. On 23 May 1986, the separation authority approved the request for discharge under the provisions of AR 635-200, chapter 10, for the good of the service in lieu of court-martial. He would be issued an Under Oher than Honorable Conditions discharge. He was reduced to the lowest pay grade PVT/E-1.

h. On 30 June 1986, he was discharged from active duty under the provisions of AR 635-200, chapter 10, in lieu of trial by courts-martial. His DD Form 214 shows he completed 2 years, 2 months and 29 days of net active service this period with loss time from 3 April 1986 – 6 April 1986.

6. On 28 April 1987, the Army Discharge Review Board denied the applicant's request for upgrade of his discharge.

7. The Army Review Board Agency (ARBA) Medical Advisor reviewed the supporting documents and the applicant's military service records. The Armed Forces Health Longitudinal Technology Application (AHLTA) & Health Artifacts Image Management Solutions (HAIMS) was not in use at the time of his service.

ABCMR Record of Proceedings (cont) AR20180007621 4

a. A review of his civilian providers report indicates he has a diagnosis of Major Depressive Disorder (MDD) and opines that it occurred during his military service. He was awarded social security disability in December 2012 but no diagnosis is provided regarding the type of disability.

b. A review of his service record indicates he was evaluated after turning himself in at Ft Belvoir and met retention standards and was cleared to return to his unit in Greece. The applicant submitted a sworn statement that he would like to renounce his citizenship as he "felt it very hard to adapt to our customs again. Everything seemed so fast and the people uncaring. That was when I began to realize that Europe was more suitable to me."

c. A review of JLV indicates he has been diagnosed with for MDD, Delusional Disorder, Unspecified Depressive Disorder, and several medical diagnoses. He was first diagnosed with Delusional Disorder in December 2015. He does not have a service connected disability rating.

d. In accordance with the 3 September 2014 Secretary of Defense Liberal Guidance Memorandum and the 25 August 2017, Clarifying Guidance there is documentation to support a behavioral health condition during his military service. The applicant met retention standards at the time of his discharge. MDD is not a mitigating factor for the misconduct that led to his discharge. The applicant also has a diagnosis of Delusional Disorder diagnosed 29 years after his discharge. There isn't sufficient documentation to indicate he was having delusional symptoms at the time of his service. However it is possible that he had some prodromal symptoms which may have contributed to his behavior. Recommend consideration of an upgrade to General from a compassionate standpoint.

8. By regulation, a member who has committed an offense or offenses, the punishment for any of which includes a bad conduct or dishonorable discharge may submit a request for discharge in lieu of trial by court-martial.

9. By regulation, an applicant is not entitled to a hearing before the ABCMR. Hearings may be authorized by a panel of the ABCMR or by the Director of the ABCMR. In this case, the evidence of record and independent evidence provided by the applicant appears to be sufficient to render a fair and equitable decision at this time. A personal appearance hearing does not seem necessary to serve the interest of equity and justice in this case.

10. The Board should consider the applicant's petition and his service record in accordance with the published equity, injustice, or clemency determination guidance

ABCMR Record of Proceedings (cont) AR20180007621 5

BOARD DISCUSSION:

After reviewing the application and all supporting documents, to include the DoD guidance on liberal consideration when reviewing discharge upgrade requests, the Board determined it could reach a fair and equitable decision in the case without a personal appearance by the applicant.

The Board also determined partial relief was warranted. Based upon the misconduct involved, the available documentation and the findings and recommendation of the medical advisor, the Board concluded there was sufficient evidence to grant clemency by upgrading the applicant's characterization of service to General, Under Honorable Conditions.

BOARD VOTE: Mbr 1 Mbr 2 Mbr 3 :BS : : GRANT FULL RELIEF : :MJB : GRANT PARTIAL RELIEF : : : GRANT FORMAL HEARING : : :MWB DENY APPLICATION

ABCMR Record of Proceedings (cont) AR20180007621 6

---

BOARD DETERMINATION/RECOMMENDATION:

1. The Board determined the evidence presented is sufficient to warrant a recommendation for partial relief. As a result, the Board recommends that all Department of the Army records of the individual concerned be corrected by reissuing the applicant a DD Form 214 showing his characterization of service as Under Honorable Conditions (General).

2. The Board further determined the evidence presented is insufficient to warrant a portion of the requested relief. As a result, the Board recommends denial of so much of the application that pertains to upgrading the characterization of his discharge to Honorable.

Recoverable Signature X Barbara Stansbury CHAIRPERSON Signed by: STANSBURY.BARBARA.1245179614 I certify that herein is recorded the true and complete record of the proceedings of the Army Board for Correction of Military Records in this case.

REFERENCES:

1. Title 10, United States Code, section 1552(b), provides that applications for correction of military records must be filed within 3 years after discovery of the alleged error or injustice. This provision of law also allows the ABCMR to excuse an applicant's failure to timely file within the 3 year statute of limitations if the Army Board for Correction of Military Records (ABCMR) determines it would be in the interest of justice to do so.

2. Army Regulation 635-200 (Personnel Separations – Enlisted Personnel), in effect at the time, sets forth the basic authority for separation of enlisted personnel.

a. Paragraph 3-7a (Honorable Discharge) states an honorable discharge is a separation with honor. The honorable characterization is appropriate when the quality of the Soldier's service generally has met the standards of acceptable conduct and performance of duty for Army personnel, or is otherwise so meritorious that any other characterization would be clearly inappropriate.

b. Paragraph 3-7b (General Discharge) states a general discharge is a separation from the Army under honorable conditions. When authorized, it is issued to a Soldier

ABCMR Record of Proceedings (cont) AR20180007621 7

whose military record is satisfactory but not sufficiently meritorious to warrant and honorable discharge.

c. Paragraph 3-7c (Under Other than Honorable Conditions) states a discharge under other than honorable conditions is an administrative separation from the service under conditions other than honorable. It may be issued for misconduct, fraudulent entry, homosexuality, security reasons, or for the good of service.

3. Army Regulation 15-185 (ABCMR) prescribes the policies and procedures for correction of military records by the Secretary of the Army, acting through the ABCMR. The ABCMR begins its consideration of each case with the presumption of administrative regularity, which is that what the Army did was correct.

a. The ABCMR is not an investigative body and decides cases based on the evidence that is presented in the military records provided and the independent evidence submitted with the application. The applicant has the burden of proving an error or injustice by a preponderance of the evidence.

b. The ABCMR may, in its discretion, hold a hearing or request additional evidence or opinions. Additionally, it states in paragraph 2-11 that applicants do not have a right to a hearing before the ABCMR. The Director or the ABCMR may grant a formal hearing whenever justice requires.

4. On 25 July 2018, the Under Secretary of Defense for Personnel and Readiness issued guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records (BCMNRs) regarding equity, injustice, or clemency determinations. Clemency generally refers to relief specifically granted from a criminal sentence. BCM/NRs may grant clemency regardless of the court-type of court-martial. However, the guidance applies to more than clemency from a sentencing in a courtmartial; it also applies to other corrections, including changes in a discharge, which may be warranted based on equity or relief from injustice. This guidance does not mandate relief, but rather provides standards and principles to guide Boards in application of their equitable relief authority. In determining whether to grant relief on the basis of equity, injustice, or clemency grounds, BCM/NRs shall consider the prospect for rehabilitation, external evidence, sworn testimony, policy changes, relative severity of misconduct, mental and behavioral health conditions, official governmental acknowledgement that a relevant error or injustice was committed, and uniformity of punishment. Changes to the narrative reason for discharge and/or an upgraded character of service granted solely on equity, injustice, or clemency grounds normally should not result in separation pay, retroactive promotions, and payment of past medical expenses or similar benefits that might have been received if the original discharge had been for the revised reason or

ABCMR Record of Proceedings (cont) AR20180007621 8

had the upgraded service characterization. AR 635-200, in effect at the time, sets forth the basic authority for the separation of enlisted personnel. //NOTHING FOLLOWS/

# MILITARY POLICE REPORT

For use of this form, see AR 190-45; the proponent agency is ODCSPER | FSCO (?) File 860407 | MP REPORT NUMBER

| THRU: | TO: | FROM: |
|---|---|---|
| | | |

**1. REPORT TYPE/STATUS** ☐ Information ☒ Complaint ☐ Supplemental ☐ Police action completed ☐ Commander's action required (See attached DA Form 3975-1) ☐ Commanders act on completed

**2. EVALUATION** ☐ Unfounded ☒ Criminal offense ☐ Serious criminal offense ☐ Military offense ☐ Traffic offense

**3. TYPE COMPLAINT:** Report of AWOL surrendered.

**4. LOCATION** ☒ On post ☐ Off post (Address): Bldg 720 Ft. Belvoir VA. 22060

**5. HOUR OF OFFENSE:** 1530 **6. DATE OF OFFENSE:** 860404

**7. OFFENSE CODE NO.:**

**8. COMPLAINT RECEIVED BY** (Name, grade, position): ANDERSON EDDIE E-6 Dsgt

☒ a. In person ☐ b. By telephone ☐ c. By mail

**d. HOUR RECEIVED:** 0950 **e. DATE RECEIVED:** 860407

**9a. MP ACTION REFERRED TO** ☐ NA ☐ Patrol ☒ MPI ☐ CID ☐ Other agency (Specify)

**b. DATE REFERRED:** 860407

**10. NAME OF SUBJECT:** MEADE Michael P. **a. GRADE:** E-5 **b. SSN:** 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

**c. ORGANIZATION** (Include address and telephone no.): 70th USAFAD Gianitsa station, Greece APO 09693 NY

**d. HOME OF RECORD:** Temple Hills MD **e. PLACE OF BIRTH:** West Germany **f. DATE OF BIRTH:** 18 Dec 61

**g. CAT (2):** A **h. COLOR HAIR:** Blonde **i. COLOR EYES:** Green **j. COMPLEXION:** Fair **k. WEIGHT:** 150 **l. HEIGHT:** 5'10" **m. AGE:** 24 **n. RACE:** CAU **o. SEX:** ☒ Male ☐ Female

**11. INVOLVEMENT** ☐ Alcohol ☐ Drugs ☐ Other (Specify)

**12. DRESS** ☐ Uniform ☒ Civilian clothing

**13. BEHAVIOR** ☒ Cooperative ☐ Uncooperative ☐ Belligerent

**14. IDENTIFYING MARKS:** "mike" left upper arm

**15. PERSONS RELATED TO REPORT**

| a. Name | b. Grade | c. SSN | d. Organization / address | e. (1) | (2) |
|---|---|---|---|---|---|
| Eccleston Thomas | O-3 | 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 | 70th USAFAD, Gianitsa Greece | B | A |
| Bucella Dennis | O-3 | UNK | SJA Defense FBVA | B | A |
| Kresnak Thomas J | MPI | 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 | MPA FBVA | E | A |
| | | | | | |
| | | | | | |
| | | | | | |

**16. PROPERTY DATA**

| a. Date | b. (3) | c. (4) | d. Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**17. DISPOSITION OF**

**a. Offender:** Rel'sd on [redacted] CN DD 629

**b. Evidence:** NONE

**18. DETAILS OF REPORT** (Who, what, when, where, how and why) (Continue on reverse)

— SEE REVERSE —

**INCLOSURES**

**DISTRIBUTION**

~~(PROVOST MARSHAL/COMMANDER (Strike out if inapplicable))~~

**TYPED NAME, GRADE, AND TITLE OF REPORTING OFFICER:** MPI Thomas J. KRESNAK

**SIGNATURE:**

| (1) STATUS | (2) CATEGORY | | (3) PROPERTY TYPE | (4) PROP ACTION | WORKLOAD DATA (MP File Copy Only) |
|---|---|---|---|---|---|
| A Subject | A Army | | A Govt fund | A Lost | FROM: |
| B Witness | B Other service | | | B Stolen | |
| C Victim | C Other govt | | | C Recovered | |
| D Complainant | D DA civilian | | | D Damaged | |
| Military police | E Civilian | | | | |
| Civilian authorities | F Contractor | | | | |
| | G Other govt emp | | | | |
| | H Foreign nation | | | | MANHOURS EXPENDED |

DA FORM 3975, 1 JAN 82 — THIS FORM ... REPLACES DA FORM 3975 ...

| FOR MILITARY POLICE | PORT | DEPARTMENT OF JUSTICE HEADING | PORT DATE | CROSS REF/CRD REPT. NO. |
|---|---|---|---|---|
| For use of this form, see AR 11; the proponent agency is ODCSPER. | | F3-00604-86 | 36APR07 | |

| THRU: | TO: | FROM: |
|---|---|---|
| | | PROVOST MARSHAL FORT BELVOIR, VA |

**1. REPORT TYPE/STATUS**
☐ Information   ☐ Complaint   ☐ Supplemental
☑ Police action completed   ☐ Commanders action required (see attached DA Form 3975 1)   ☐ Commanders action completed

**2 EVALUATION**   ☐ Unfounded   ☐ Criminal offense   ☐ Serious criminal offense   ☑ Military offense   ☐ Traffic offense

**3 TYPE COMPLAINT**
REPORT OF AWOL SURRENDERED TO MILITARY CONTROL

**4 LOCATION** ☐ On post ☐ Off post
MP STATION, FBVA

**5 OFFENSE** 1530/2 86APR07 F3-00604

**6 YOUR DE IS DATE OF OFFENSE**

**7. OFFENSE CODE NO**
5W2

**8 COMPLAINT RECEIVED BY (Name, grade, position)**
ANDERSON, EDDIE, E-6, D/SGT

a. In person
b. By telephone
c. By mail

**9. HOUR RECEIVED** 0950   **e DATE RECEIVED** 36APR07

**9a. MP ACTION REFERRED TO**
☐ NA   ☐ Patrol   ☐ MPI   ☐ CID   ☐ Other agency (Specify) KRESNAK

**b. DATE REFERRED** 36APR07

| 10. NAME OF SUBJECT | j. GRADE | e SSN | c. ORGANIZATION (include address and telephone no.) |
|---|---|---|---|
| MEADE, MICHAEL R. | E-5 | 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 | 70TH USAFAD, GIANITSA STATION, GREECE |

| d. HOME OF RECORD | e. PLACE OF BIRTH | f. DATE OF BIRTH |
|---|---|---|
| TEMPLE HILLS,MD | WEST GERMANY | 61DEC18 |

OTHARM

| j. CAT (2) | h. COLOR HAIR | i. COLOR EYES | j. COMPLEXION | k WEIGHT | l. HEIGHT | m. AGE | n. RACE | o. SEX |
|---|---|---|---|---|---|---|---|---|
| A | BLONDE | GREEN | FAIR | 150 | 5'10" | 24 | C | ☑ Male ☐ Female |

**11. INVOLVEMENT** ☐ Alcohol ☐ Drugs   ☐ Other (Specify)

**12. DRESS** ☐ Uniform ☐ Civilian ☐ Clothing

**13. BEHAVIOR** ☐ Cooperative ☐ Belligerent ☐ Uncooperative

**14. IDENTIFYING MARKS** TATOO "MIKE" LEFT UPPER ARM

**15. PERSONS RELATED TO REPORT**

| a. Name | b. Grade | c. SSN | d. Organization - address | e.(1) (2) |
|---|---|---|---|---|
| ECCLESTON, THOMAS | O-3 | 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 | 70TH USAFAD GIANITSA STATION, GREECE | B A |
| JUCELLA, DEBBI | O-3 | | SJA DEFENSE, FBVA | B A |
| KRESNAK, THOMAS J. | MPI | 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 | MPA, FBVA | E A |

**16. PROPERTY DATA**

| a. Date | b. (2) | c. (4) | d. Amount | a. Offender | b. Evidence |
|---|---|---|---|---|---|
| | | | | | |

**17. DISPOSITION OF**

**18. DETAILS OF REPORT** (Who, what, when, where, how and why) (Continue on reverse)

8 APR 1986      SEE REVERSE

**INCLOSURES**
1-DD 629
1-DA 3881
1-DA 2823

**DISTRIBUTION**
1-PM File
1-70th USAFAD, Gianitsa St., Greece
1-Susp (30May86)

**FOR THE COMMANDER (Strike out if inapplicable)**
TYPED NAME, GRADE AND TITLE OF REPORTING OFFICER   DAVID L. DONAHUE
1LT, MP
ASST ADJ

SIGNATURE

| (1) STATUS | (2) CATEGORY | (3) PROPERTY TYPE | (4) PROP ACTION | WORKLOAD DATA (MP File Copy Only) |
|---|---|---|---|---|
| A - Subject<br>B - Witness<br>C - Victim<br>Complainant<br>Military police<br>Civilian<br>authorities | A - Army<br>B - Other service<br>Other nat'l<br>Other<br>E - Civilian<br>F - Contractor<br>G - Other govt emp<br>H - Fgn nat'l empl | Other gn<br>nat'l<br>A - Govt prop funds<br>B - Govt venicle<br>C - NAF non funds<br>D - Non venicle<br>E - Pvt property<br>F - Pvt venicle<br>G - Host govt prop funds<br>H - Host govt venicle | A - Lost<br>B - Stolen<br>C - Recovered<br>D - Damaged | FROM<br>TO |
| FOR OFFICIAL USE ONLY | | | | MANHOURS EXPENDED |

**DA FORM 3975** 1 JAN 74   THIS FORM TOGETHER WITH DA FORM 3975-1, 1 NOV 71 REPLACES DA FORM 3975, 1 NOV 72 AND DA FORM 3975-1, 1 SEP 69 WHICH ARE OBSOLETE.   ☆ GPO 1984-441-990

**RIGHTS WARNING PROCEDURE/WAIVER CERTIFICATE**

For use of this form see AR 190-30; the proponent agency is OSCPER.

**3**

DATA REQUIRED BY THE PRIVACY ACT

A  ORITY:                     Title 10, United States Code, Section 3012(a).
Ph  CIPAL PURPOSE:             To provide commanders and law enforcement officials with means by which information may be accurately identified.
ROUTINE USES:                 Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval.
DISCLOSURE:                   Disclosure of your Social Security Number is voluntary.

| LOCATION | DATE | TIME | FILE NO. |
|---|---|---|---|
| Bldg 231 Ft Belvoir VA | 86OCT07 | 1020 | |

| NAME (Last - First - MI) | ORGANIZATION OR ADDRESS |
|---|---|
| MEADE, Michael R | 7Crh USA FAD |
| SOCIAL SECURITY NO.   GRADE/STATUS | GIANNITSA station, GREECE |
| 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    E-5 | APO 09695 NY |

**SECTION A - RIGHTS WAIVER/NON-WAIVER CERTIFICATE**

**RIGHTS**

The investigator whose name appears below told me that he/she is with the United States Army Provost Marshal's Military Police Investigations, and wanted to question me about the following offense(s) of which I am suspected/accused: A630l

Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:

1. I do not have to answer any questions or say anything.

2. Anything I say or do can be used as evidence against me in a criminal trial.

3. (For personnel subject to the UCMJ) I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

or

(For civilians not subject to the UCMJ) I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. However, I understand that I must make my own arrangements to obtain a lawyer and this will be at no expense to the Government. I further understand that if I cannot afford a lawyer and want one, arrangements will be made to obtain a lawyer for me in accordance with the law.

4. If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below.

COMMENT (Continue on reverse side)

**WAIVER**

I understand my rights as stated above. I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

| WITNESSES (If available) | SIGNATURE OF INTERVIEWEE |
|---|---|
| NAME (Type or Print) | |
| ORGANIZATION OR ADDRESS AND PHONE | SIGNATURE OF INVESTIGATOR |
| NAME (Type or Print) | TYPED NAME OF INVESTIGATOR |
| ORGANIZATION OR ADDRESS AND PHONE | MPI Thomas J KRESNAK |
| | ORGANIZATION OF INVESTIGATOR |
| | MPA Ft Belvoir VA. |

**NON-WAIVER**

I do not want to give up my rights.

☑ I want a lawyer.                    ☐ I do not want to be questioned or say anything.

SIGNATURE OF INTERVIEWEE
Michael R. Meade

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT (DA FORM 2823) SUBSEQUENTLY EXECUTED BY THE SUBJECT SUSPECT/ACCUSED.

DA FORM 3881
NOV 84                    EDITION OF MAY 81 IS OBSOLETE.

iv

## SECTION 8 - RIGHTS WARNING PROCEDURE

### THE WARNING

1. WARNING - Inform the suspect/accused of:

   a. Your official position.

   Nature of offense(s).

   c. The fact that he/she is a suspect/accused.

2. RIGHTS - Advise the suspect/accused of his/her rights as follows:

   "Before I ask you any questions, you must understand your rights."

   a. "You do not have to answer my questions or say anything."

   b. "Anything you say or do can be used as evidence against you in a criminal trial."

   c. (For personnel subject to the UCMJ) "You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during

questioning. This lawyer can be a civilian you arrange for at no expense to the Government or a military lawyer detailed for you at no expense to you, or both."

- or -

(For civilians not subject to the UCMJ) "You have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with you during questioning. However, you must make your own arrangements to obtain a lawyer and this will be at no expense to the Government. If you cannot afford a lawyer and want one, arrangements will be made to obtain a lawyer for you in accordance with the law."

d. "If you are now willing to discuss the offense(s) under investigation, with or without a lawyer present, you have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if you sign a waiver certificate."

Make certain the suspect/accused fully understands his/her rights.

### THE WAIVER

"Do you understand your rights?"
(If the suspect/accused says "no," determine what is not understood, and if necessary repeat the appropriate rights advisement. If the suspect/accused says "yes," ask the following question.)

"Do you want a lawyer at this time?"
(If the suspect/accused says "yes," stop the questioning until he/she has a lawyer. If the suspect/accused says "no," ask him/her the following question.)

"At this time, are you willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer and without having a lawyer present with you?"
(If the suspect/accused says "no," stop the interview and have him/her read and sign the non-waiver section of the waiver certificate on the other side of this form. If the suspect says "yes," have him/her read and sign the waiver section of the waiver certificate on the other side of this form.)

### SPECIAL INSTRUCTIONS

WHEN SUSPECT/ACCUSED REFUSES TO SIGN WAIVER CERTIFICATE: If the suspect/accused orally waives his/her rights but refuses to sign the waiver certificate, you may proceed with the questioning. Make notations on the waiver certificate to the effect that he/she has stated that he/she understands his/her rights, does not want a lawyer, wants to discuss the offense(s) under investigation, and refuses to sign the waiver certificate.

IF WAIVER CERTIFICATE CANNOT BE COMPLETED IMMEDIATELY: In all cases the waiver certificate must be completed as soon as possible. Every effort should be made to complete the waiver certificate before any questioning begins. If the waiver certificate cannot be completed at once, as in the case of street interrogation, completion may be temporarily postponed. Notes should be kept on the circumstances.

PRIOR INCRIMINATING STATEMENTS:

(1) If the suspect/accused has made spontaneous incriminating statements before being properly advised of his/her rights, he/she should be told that such statements do not obligate him/her to answer further questions.

(2) If the suspect/accused was questioned as such either without being advised of his/her rights or some question exists as to the propriety of the first statement, the accused must be so advised. The office of the serving Staff Judge Advocate should be contacted for assistance in drafting the proper rights advisal.

NOTE: If (1) or (2) apply, the fact that the suspect/accused was advised accordingly should be noted in the comment section on the waiver certificate and initialed by the suspect/accused.

COMMENT (Continued)

Reverse of DA Form 3881

☆ U.S. G.P.O. 1985-461-033/27044

v

## SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is Office of The Deputy Chief of Staff for Personnel.

| LOCATION | DATE | TIME | FILE NUMBER |
|---|---|---|---|
| Bldg. 731 Ft. Belvoir Va | 860407 | 19.05 | |

| LAST NAME, FIRST NAME, MIDDLE NAME | SOCIAL SECURITY NUMBER. | GRADE/STATUS |
|---|---|---|
| MEADE, Michael R. | 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 | E-5 |

ORGANIZATION OR ADDRESS

70th USAFAD, Gianitsa Station, GREECE

I, Michael R. MEADE, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

After thorough thought I have come to the conclusion that I would
like to renounce my American Citizenship. I do not want this to be
taken negatively. I would never divulge any information about this
country. I love this country and always will until I die. This whole
situation started in 1979 when I went to Italy back in 1979 and stay-
ed until 1982. Being at a young and influential age (17) things were
calm, nice and the people very friendly. I could go anywhere in that
country at anytime without having anybody bother me. Where as in the
area I live in here it is very dangerous to walk anywhere. One thing;
.this is not in any way a political statement or in anyway a meant to
reflect badly on the United States. Upon arrival back to America in
1982 I felt it very hard to adapt to our customs again. Everything
seemed so fast and the people uncaring. That was when I began to
realize that Europe was more suitable to me. (Personally) you have to
understand I have always kept to one friend or a few at the most,
never in a large crowd. To refer back to the Army, I have always gave
100% at what I did. I went through as many schools as possible such as
31V, 31C, A4, V9, Jump school, Air Assault, Recondo, BLC, PLC, 11B
by correspondence, NBC school and some colledge courses. While in Itlay
I also made soldier of the qtr. for my Arty GP. Plus all EER's and
letters of commendations. But after many years of doing the samething
it got nonotenous. This is only a brief statement and anything I left
out I will say it verbally. Enclosing, I am in fear of what is going
to happen and made my decision and can't turn back on it now.//////////
///END STATEMENT///.

| EXHIBIT | INITIALS OF PERSON MAKING STATEMENT | | PAGE 1 OF | PAGES |
|---|---|---|---|---|

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF___ TAKEN AT___ DATED___ CONTINUED."
THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT AND
BE INITIALED AS "PAGE___ OF___ PAGES." WHEN ADDITIONAL PAGES ARE UTILIZED, THE BACK OF PAGE 1 WILL
BE LINED OUT, AND THE STATEMENT WILL BE CONCLUDED ON THE REVERSE SIDE OF ANOTHER COPY OF THIS FORM.

A, FORM 2823    SUPERSEDES DA FORM 2823, 1 JAN 68, WHICH WILL BE USED.
JUL 72

STATEMENT (Continued)

---

**AFFIDAVIT**

I, __Michael R. MEADE__ , HAVE READ OR HAVE HAD READ TO ME THIS STATE-
MENT WHICH BEGINS ON PAGE 1 AND ENDS ON PAGE __1__ . I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT
MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE
CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT
OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

_Michael R. Meade_
(Signature of Person Making Statement)

WITNESSES:

Subscribed and sworn to before me, a person authorized by law
to administer oaths, this _07_ day of _April_ , 19 _86_
at _Bldg. 73, Ft. Belvoir Va. 22060_

ORGANIZATION OR ADDRESS

(Signature of Person Administering Oath)

_MPI Thomas J. KRESNAK_
(Typed Name of Person Administering Oath)

ORGANIZATION OR ADDRESS

_Art. 136 (B) (4) UCMJ._
(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT  _M.R.M._                PAGE    OF    PAGES

BEST COPY

James R. Meade
1188 Park Dr.
Casselberry, FL 32707-3594

February 17, 1999

Dear Sir,

I am writing this letter in regards to my son Michael D. Meade Sr. 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. Ct Following is a list of the items that pertain to the letter you wrote to Michael about his appeal.

1. Michael turned himself in at Fort Belvoir, Virginia, after being AWOL only 3 days from Grece. My wife and I brought Michael to Fort Belvoir in our car. The reason I know he was only AWOL for 3 days is because we talked to Captain Eccelston in Grece. He wanted Michael to return to Grece.

2. Next we went to the Hoffman Building and was told by the colonel that they were going to let Michael have a stateside assignment. This never happened.

COPY MADE BY VARMC, ST. LOUIS FROM A RECORD IN VA'S POSSESSION

vii

## RECEIPT FOR PRISONER OR DETAINED PERSON

| RECEIVED FROM (Unit or Agency and Station) | | TIME | DATE |
|---|---|---|---|
| PROVOST MARSHAL OFFICE, FBVA. | | 1950 HRS  cccE | 7 APR 86  860407 close |

| LAST NAME - FIRST NAME - MIDDLE INITIAL | SERVICE NUMBER, SSN | GRADE |
|---|---|---|
| ..ADE, MICHAEL R. | 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 | E-5 |

| ORGANIZATION | STATION |
|---|---|
| 70TH USAFAD | GIANITSA STATION, GREECE |

**OFFENSE**

AWOL (ART-86 UCMJ)

**PERSONAL PROPERTY**

RETAINED ON PERSON.

**REMARKS**

REPORT TO FOLLOW.

| NAME AND TITLE OF PERSON RECEIVING ABOVE INDIVIDUAL (Typed or Printed) | SERVICE NUMBER/SSN | GRADE |
|---|---|---|
| Collins  Charles C. | 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 | O-1/2LT |

| RECEIVING UNIT OR AGENCY AND STATION | SIGNATURE |
|---|---|
| Co. A , 3rd BN | 2LT Charles C. Collins |

**DD FORM 629** , 1 MAR 80    EDITION OF 1 MAR 52, IS OBSOLETE.    U.S.GPO.1982-0-361-646/8234



vii

**DEPARTMENT OF THE ARMY**
Headquarters, 558th United States Army Artillery Group
APO New York 09257

ORDERS 62-5                Plaintiff's Exhibit        30 April 1986        **23**

MEADE MICHAEL R 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 SGT 70th United States Army Field Artillery Detachment
(WA39AA) APO New York 09693 (Greece)

You will proceed on permanent change of station as shown.  Information concerning your
portcall will be provided separately.

Assigned to: United States Army Personnel Control Facility (W1DC1E) Fort Dix, New
Jersey 08640-7230
Reporting date:   30 April 1986
Additional instructions:  (a)  You are authorized shipment of household goods and
privately owned vehicle at government expense.
(b)  If you plan to ship personal property at government expense, contact your local
transportation office within 10 working days after receipt of these orders to arrange
for delivery.
(c)  You will submit a travel voucher after completion of this travel to the custodian
of your finance records at your new duty station within 15 days after arrival.
(d)  You are required to report to the Family Housing/Housing Referral Office at your
new duty station before you make any arrangements for renting, leasing, or purchasing
any off-post housing.
(e)  You will report to your local Housing Referral Office for initial Temporary
Lodging Allowance Briefing prior to contacting your local transportation office.
(f)  You will contact the Military Airlift Command Terminal at least 30 days prior to
your availability date to arrange for flight reservation.
(g) All Southern units of 558th USAAG will contact Army Liaison 30 days prior to
availability date to arrange for portcall.
(h) SM must travel in Class A or Class B Uniform.

FOR ARMY USE
Tier: PA PSG std 0312302 Apr 86           Con speciality: NA
Asg chnge Rsn: 31C20V900                  PMOS/PSSI: 31C20V900
Pers sec rsn: NA                          Enl/REENLB indic: NA
MDC: ~AE5                                 PPD: NA
IIC: 215A63                               Aval date: 30 April 1986
PEED: NA                                  Proj speciality: NA
Format: 414

FOR THE COMMANDER:

120/005
DISTRIBUTION:
C Plus
Cdr, 70th USAFAD:  (2)
Cdr, USA PCF Ft Dix, NJ  08640-7230:  (2)        JAMES M. TISDALS
Indiv:  (60)                                     CW3, USA
  :  (1)                                         Personnel Officer
Headstart:  (2)

**A.**[ix] In **September of 1985** after a short leave I arrived in Athens, Greece and after a two-week orientation briefing at the 558th Artillery Group was assigned and reported to my duty station, the 70th USAFAD located in Yanissa, Greece (Northern).

**B.** My first weeks there in **September of 1985** I was learning the communications procedures for this type of unit that contained and maintained nuclear artillery rounds. After a few weeks, I took over as the Communications Sergeant (NCOIC) for the Com Cen and everything was running smooth. For several months, thereafter there was no problems in the Com Cen or on the detachment with the commander, Captain Shanks. At the end of those several months is when the problems started happening when a new commander, Captain Eccleston took charge.

**C.** During his tenure, I became aware of blatant security violations that showed the careless disregard for the custody of the nuclear rounds.

**D.**     For example, one day I picked up the unsecure Ta-312 Field Phone in the Communications Center of the 70th USAFAD and was about to use it when I heard one of the field artillery team leaders, a Staff Sergeant (Senior NCO) Munn on another unsecure Ta-312 Field Phone at the detachment give out the A-Side Combination of the two-man control safe to another Staff Sergeant (SSG) that was located inside the Central Guard House (CGH) used to store the keys that opened up the high security locks securing the Igloos inside the double perimeter barbed wired fence where the nuclear rounds were stored. As I was about to put the Ta-312 field phone back down I distinctly heard SSG. Munn say to the other Senior NCO on the other end that he gave them the combination because he didn't want to walk down there.

**E.** This Ta-312 unsecure Field Phone was attached by wires in what was known as the Red Leg hot loop between the 70 USAFAD Detachment, the CGH, the Greek Guardhouse at the entrance to the 70 USAFAD Detachment and our higher headquarters, the 558th Artillery Group located just outside of Athens, Greece. The problem with these Ta-312 unsecure field phones is that they were attached by two wires in between that loop, and anybody could covertly splice in and listen to your conversations.

**F.** Being that I was an E-5 Sergeant at the 70th USAFAD I had the B-Side Combination to the two-man control safes so when I heard SSG. Munn give out the A-Side Combination it effectively caused the loss of two-man control.

**G.**     In another incident, the Comsec Custodian Sgt. Harold Machado at the 70th USAFAD in Yanissa, Greece changed the safe combinations on the two-man control safes and didn't right them down and couldn't open them. The commander, Cpt. Eccleston after verbally reprimanding the Comsec Custodian ordered the Greek host nation Boeing Employees to drill the two-man control

safes and then they were immediately put back in use storing Top Secret, SCI material. It's totally against protocol to use safes that have been drilled because they are compromised, and you never know if they were drilled again because they already have repairs to the outer case.

**H.**      Additionally, Sgt. Harold Machado personally told me that he felt it was the commanders fault and went on to say that he had written down everything that had happened with the safes, to include several pages more of other illegal things that the commander was doing and about what was wrong in the unit and put it in a sealed envelope and left it at his Greek neighbor's house whom he claimed told him he had worked for the CIA. Sgt. Harold Machado went on to tell me that he left instructions with this Greek man to send this letter containing several pages to the United States if anything happened to him. I was genuinely concerned about this because Sgt. Harold Machado was the Comsec Custodian who strictly dealt with Top Secret SCI Material inside the vault, and I felt this was bizarre to leave an envelope with potentially numerous Top Secret SCI violations of security in a nuclear setting with his Greek neighbor whom he claimed had worked for the CIA. The proper channel for Sgt. Harold Machado to report these Security Violations was to our higher headquarters, the 558th Commander located in Athens, Greece.

**I.** For the proper **safe**guarding of TS SCI Material at the 70th USAFAD, like the keys to the igloos, Encoding and Decoding Charts, CEOI's, Authentication charts and the permissive action link (**PAL**) unlock codes for the nuclear rounds required two-man control. To do this these safes were equipped with two sets of locks with separate combinations that had to be correctly dialed in before they could be opened to gain access. One side or one lock was designated the A-Side, and the other lock or other side was designated the B-Side. In the 70 USAFAD the commander designated all the officers and Senior NCOs to have the A-Side Safe Combinations and the enlisted personnel to have the B-Side Safe Combinations.

**J.** These violations of two-man Control of TS SCI material at the 70th USAFAD should have been reported to the 558th Artillery Group and a Confidential -6 Report detailing the situation should have been sent by the Commander immediately to the Joint Chiefs of Staff at the Pentagon.

**K.**      Another incident was when I walked into the unlocked library of the 70th USAFAD and found a document marked "Confidential" just sitting on the table that was a color-coded diagram showing the proper assembly of the nuclear round used for the **8-inch (203 mm) M110 Howitzer**. I started asking around and found out it was another Staff Sergeant, Senior NCO (Vietnam Veteran) who had left this document in the library because he personally told me this. It was this same SSG, Senior NCO (Vietnam Veteran) who would come and volunteer to operate the com cen at night when I was on duty and would also spend an hour or two in the vault, in the back. Every morning when this Senior NCO came into the detachment, I could smell a strong odor of alcohol on his breath. Being an

alcoholic, having a wife back in the U.S., and having a Greek Girlfriend meant he had to have a lot of cash to maintain his extravagant lifestyle. This was all the things a Foreign Agent needed to blackmail this Senior NCO to obtain Top Secret classified information from the detachment.

**L.** In another incident, late in the evening when I was on duty and monitoring the regular phone in the Comcen there was the other Staff Sergeant (Senior NCO) who had received the A-Side Combination from Staff Sergeant Munn to the safe in the CGH talking to his Greek girlfriend, (although he was married back in the states to a lady in the Navy) telling her what he did at the 70the USAFAD.

**M.** On top of this there were three active homosexuals at the detachment, one enlisted man working in the com cen and the other two enlisted men working on the artillery teams which were a serious threat as they could be blackmailed by foreign agents into giving information in return for not reporting them to the military authorities. On several occasions, I personally seen these two enlisted men on the artillery teams downtown in the company of several Greek males and they personally told me that they would go to the discos to pick up Greek men and I told them I didn't agree with their behavior. About a week later I noticed one of these homosexuals downtown near my apartment pointing in my direction to a well-dressed man accompanying him, stereotypically, with lots of rings on his finger.

**N.** I guess the commander didn't realize that possibly a few of his men were in compromising positions where they could potentially be blackmailed into selling secrets and by the commander not reporting these security violations meant no trained American agents would be notified who could investigate these matters.

**O.** A new communications sergeant arrived at the 70th USAFAD Detachment and on the third day of his orientation Sgt. Smith brought a camera with a photo lens into the Communications Center (Comcen) when on the door its clearly written in large bold type no cameras allowed. When I confronted Sgt. Smith that there were no cameras allowed in the Comcen he stated that he was in charge now and outranked me because he had more time in grade. When I left the Comcen a few minutes later Sgt. Smith still had his camera and remained in there the rest of the day.

**P.** I brought these security violations of Top-Secret SCI information up to my commander by respectfully knocking on his door and after being given permission entering. When I went into Captain Eccleston's office and showed him a copy of all these security violations that I had written down. The commander read these violations, one by one, and became furious and threw them on the floor and told me to get the f—k out of his office. As I was leaving his office, I could hear Captain Eccleston on the unsecure telephone/landline saying he wanted to talk to the commander of the 558th Artillery Group, our immediate headquarters. A few seconds later I heard Captain Eccleston addressing a Colonel

Case 6:22-cv-00324-CEM-LHP   Document 1   Filed 02/11/22   Page 49 of 72 PageID 49

49

on the unsecure phone/ landline talking about all the security violations that I
had reported to him about the 70ᵗʰ USAFAD. I knew it was his boss because he
was addressing him as sir.

**Q.**     Immediately after I had reported these TS SCI violations in my unit to Cpt.
Eccleston one of my soldiers, Sp4 Edward Taylor (ET) told me that the
commander was out to get me and without my knowledge secretly called a hasty
impromptu meeting with all the enlisted soldiers that worked for me in the
communications center and told them to write derogatory statements against me.

**R.**     That afternoon after reporting the security violations to the commander I
noticed one of these homosexuals downtown near my apartment pointing in my
direction to a well-dressed man accompanying him, stereotypically, with lots of
rings on his finger. I became very apprehensive and felt as if I was being targeted
so I grabbed some clothes and went back to the base.

**S.**     A couple of hours later Sgt. Smith invited me to have a drink at the small
bar on the compound. Sgt. Smith sat down at the bar as I was drinking a beer and
then slid a shot of something over to me on the bar and told me to drink it. That
was the last thing I remembered until the next morning when I woke up still on
the base laying on my back of a small four-foot-long by ten-inch-wide bench with
my legs and feet dangling, uncontrollably vomiting with my entire body covered
in layers of vomit. I had never been that sick in my entire life and honestly felt
that I was poisoned. That is when Sgt. Harold Machado told me that I was
screaming and hollering at the CO, that I had cursed out Cpt Eccleston even
though I did not remember doing it.

**T.** In my 201 Personnel File since 1986 (35 years), currently in the possession of
ARBA, the ABCMR, is a Classified Confidential Report detailing the above
incident in the bar at the 70ᵗʰ USAFAD on or about April 3rd, 1986.

**U.**     I only brought these security violations up to my commander's attention so
they could be corrected not to create a problem. Considering the gravity of these
security violations it was the least that I could have done at the time. It was not as
if I was picking on the commander or trying to go by the book or looking for any
little thing to say something.

**V.** The fact is that the commander's leadership directly contributed to these
violations by his attitude.

**W.**     For example, the commander allowed the entire basketball team to go
down south (Athens) for two weeks to play basketball while the remaining
personnel were required to work harder and take up the slack by pulling
additional guard duty on the hill (CGH).

49

**X.**      Cpt. Eccleston also took one Artillery team off Central Guard House (CGH) duty and designated them for administrative duties which meant less men for guard duty and that the Artillery team was not training nor could it do the required mission when required.

**Y.**      Additionally, the commander didn't follow the regulations when it came to keeping a sign-in and out sheet log to insure we had 12 men on the detachment always in case a destruct order came down from our higher headquarters in Heidelberg, Germany, Supreme Headquarters Allied Forces Europe (SHAFE). There were also requirements for the Comsec Custodian and the Com Cen to be able to destroy all the classified documents in a certain amount of time using precisely drawn-out emergency plans.

**Z.** This gave the perception that they were in Greece on holiday because the commander put no emphasis on duty coming first because it took a back seat to sports and other extracurricular activities.

**AA.**      When I arrived at the 70th USAFAD I was quite concerned about the AN/MSC-64 Satellite Terminal being remoted into the Com Cen. This posed a various serious problem on many levels when the detachment had to deploy because the components in the com cen had to be reinstalled in the 2 ½ ton truck and the 100 Amp,28V DC Power Kit had to be initiated to maintain continuous communications. Due to the 24 hour, 7 days a week responsibility to provide communications the system was only put back in the vehicle one time. Additionally, the 2 ½ ton truck that the AN/MSC-64 was mounted in was not regularly driven off the compound to insure it worked properly and the tires were already dry-rotting because the vehicle had not been moved in months before I had even arrived there, and this was a clear indication that many other parts were failing or about to fail once the vehicle was moved.

**BB.**      When I arrived at the 70th USAFAD I was also quite concerned that the AN/GRC-142 Radio Teletypewriter (RATT) Rig was sitting on a platform on the ground, using AC power from the building and that it was not mounted in the back of the pickup truck bed that it came in nor was the 5KW Generators mounted on the trailer. None of the 5KW generators were ever operated with the power cable hooked up to the RATT Rig to insure they even ran properly and the truck that the RATT Rig was supposed to be mounted in was not regularly driven off the compound. Additionally, the antenna masts and the GRA-50 were inside of the Communications shack and were never erected or the frequencies cut. Finally, the 100 Amp,28V DC Power Kit was never used and did not even know if it worked properly so this posed a various serious problem if the detachment had to deploy while maintaining continuous communications.

**CC.**      The AN/GRC-142 Radio Teletypewriter (RATT) Rig contained the AN/GRC-106 AM Radio used to communicate between the headquarters element and the Artillery Teams.

**DD.**   When I arrived at the 70ᵗʰ USAFAD I was quite concerned that the AN-GRC-106 AM Artillery Team Radios were not regularly mounted and used in the jeeps and that the 3KW Generators were not regularly started and maintained by the Artillery Teams. Additionally, the antenna masts and the GRA-50's for the Artillery Teams were left inside of the Communications shack along with the AN/GRC-106 Radios and 3KW Generators and were never erected or the frequencies cut on them. In fact, the only maintenance and inventory on the AN/GRC-106 Radios, the 3KW Generators, the antenna masts and GRA-50's were by the Com Cen.

**EE.**   I was continuously trying to have these team members trained in Communication procedures but faced many obstacles.

**FF.**   First, the Commo Section in 1985-1986 was always short of personnel, being around five (5) or six (6) people in total. From these five or six people, including myself, I had to maintain a twenty-four-hour communications center (com cen) that operated seven days a week, 365 days a year.

**GG.**   The Com Cen had a lot of equipment such as, the AN/MSC-64 Satellite Terminal, the Microwave feed for the Greenbox (Voice) and the enhance (data), an AM (voice) radio, telephone (landline) with the KL-42 for authentication and encrypting messages to be sent and received. In addition to this you had the encode and decode books from SETAF and SHAPE, the various nuclear message formats, the crypto codes for the KN-2 used to encrypt the Satellite Terminal, the authentication books for the Greenbox, AN/MSC-64 and the AM Radio, and finally, the positioning for the AN/MSC-64, the Greenbox, and the AM Radio.

**HH.**   Many of the new people that arrived in the commo section were right out of school or had not been in a Nuclear Duty Position. This left me to spend many hours watching over their shoulders to make sure that they were operating correctly. Just to clarify one thing, just because a soldier has been to school and graduated does not mean he can jump right into operating in a communications center. It requires months of on-the-job training, being that I was in a live situation in a Nuclear Duty position where any mis-authentication would quickly escalate to a major problem meant I stayed on the detachment long hours to insure this didn't happen to keep things flowing smoothly.

**II.**   A simple mis-authentication at our detachment meant the Staff Duty Officer (SDO) from SETAF (Italy) would call and talk to the operator then ask him to authenticate on the KL-42 to make sure we were not under duress. If we could not authenticate properly the SDO from SHAPE would call to further verify the situation. If the problem still could not be resolved, then it was possible that the Joint Chiefs of Staff at the Pentagon would be notified within an hour.

**JJ.**    The com cen operators had to know when to change the crypt codes, had to be able to authenticate within seconds when challenged by headquarters in Germany, which was an everyday event, done randomly. So, there was a lot more to the com cen then it would seem likely, that is why I had to stay on the detachment long hours every day.

**KK.**    It was virtually impossible to schedule any training because the Artillery team members were also on twenty-four-hour guard duty downrange at the CGH guarding the nuclear rounds, with three people on shift at a time. As I previously mentioned there were only two teams pulling shifts as the commander pulled one team off the hill (downrange) and when the basketball team went down south this put an additional strain on the Artillery Team Members.

**LL.**    The Artillery team members, Senior NCO's and First Lieutenant Artillery Team Leaders had no school training on operating the An-GRC-106 AM Radio, using the Communication Electronics Operating Instructions (CEOI's), authentication, encoding/decoding, safely erecting and cutting the frequency for the antennas without and knew the proper safety procedures to avoid being fatally shocked by 10,000 Volts, safely operating the 3KW Generators without being fatally shocked by the power terminals, and maintaining and troubleshooting the radios and generators. Without this basic knowledge, it would be inconceivable in my expert opinion from years of experience in maintaining this type of equipment to properly operate the equipment and or to prevent a serious injury or death.

**MM.**    That is why I feel that the Joint Chiefs of Staff at the Pentagon is clearly at fault because their policies and procedures were flawed from the inception and there was no way the mission could have been carried out properly with the lack of communications training by the Artillery Team Members prior to arriving at the detachment and no emphasis put on communications while at the detachment.

**NN.**    The commander was disinterested in communications and along with the Artillery Officers and Senior Artillery NCOs didn't seem to understand the real importance of communications training and thought since the nuclear round was transported and assembled by and shot from the 8-inch gun by them that communications was a minor aspect.

**OO.**    I tried to explain and to clarify to the Senior Artillery NCO's and the Artillery Officers that their teams would deploy separately from each other and the headquarters element in case of an emergency. That their respective Artillery teams would be required to provide and maintain their own communications without assistance from me, the headquarters element. Furthermore, I told them that if they lost communications with me when they deployed that I would have to assume they had lost control of their nuclear rounds and that I would not be

able to give them the Permissive Action Link (PAL) codes to unlock the nuclear rounds.

**PP.** So, the key role communications play during deployment is that of security, by letting the headquarters element know you are safe and to receive the nuclear messages that contain the PAL unlock codes.

**QQ.** If communications were not maintained during deployment the headquarters element would have to assume that the team or teams had lost control of the nuclear rounds in their custody and not that an untrained or undertrained field artillery man with little or no experience with communications was having problems. The headquarters element would not be able to send the PAL codes if a deployed team had lost communications because it could be possible that the enemy could have very easily stolen these codes and was waiting on the message with the unlock codes.

**RR.** Considering that terrorist and hostile forces are quite capable of understanding are communications procedures in authentication, encode and decode leaves the prospect that by compromising one team you could compromise the whole detachment. Taking into consideration the numerous security violations at the detachment would leave the question open if foreign agents, enemies, and terrorists had known our commo procedures quite well and was maybe planning a hostile act against the U.S. if not now in the distant future. Remember that a lot of unclassified information put together can very easily become useful classified information.

**SS.** The point I'm making here is that commo is paramount to the detachments mission in everyday security, but this same vigilance and concern seemed void and lacking when it came to deployment, which would be in time of a crisis of the utmost importance for carrying out the mission and preventing the loss of control of nuclear weapons in a hostile, unforgiving, and constantly changing environment.

**TT.** The fact is that the American people entrusted the security of the nation and their lives into our hands and to operate any other way but appropriate is a total and gross violation of judgment. What you practice in peacetime will be the way you perform in war as your training will take over.

**UU.** I was also concerned with and knew what had happened in Greece and Europe that culminated with the Bombing of Libya.

**VV.** **2 February 1985,** *Bobby's Bar* in Glyfada, a suburb of Athens in Greece, was bombed. The bar was popular with American airmen stationed at the nearby Hellenikon Air Base. Police spokesman Nikos Gizas said about fifty of the

injured were Americans. Some of them were brought to U.S. bases in West Germany for treatment.

**WW.  March of 1986** after providing support for the **1985 terrorist attacks** against airports in Rome and Vienna, Libyan leader Colonel Muammar Gaddafi indicated that his regime would continue to aid in similar endeavors. Openly backing terrorist groups such as the **Red Army Faction** (Italy) and the **Irish Republican Army**, he also attempted to claim the entire Gulf of Sidra as territorial waters. A violation of international law, this claim led President Ronald Reagan to order three carriers from the US Sixth Fleet to enforce the standard twelve-mile limit to territorial waters. **(The FBI Headquarters, FBI-CI Agent Del Spry (Counterintelligence, spy-catcher) in 1991 try to falsely accuse me of being a member of the Irish Republican Army involved with political killings in Ireland.)**

**XX.**   On **March 23/24, 1986,** crossing into the gulf, American forces engaged the Libyans in what became known as the Action in the Gulf of Sidra. This resulted in the sinking of a Libyan corvette and patrol boat as well as strikes against selected ground targets. In the wake of the incident, **Gaddafi called for Arab assaults on American interests.**

**YY.**   **April 2, 1986,** four people, including an eight-month-old baby, were sucked out of a TWA passenger jet after an explosion ripped a hole in its side. The Boeing 727 was flying at 11,000 feet (3,350 meters) over Greece, on its way to Athens, when the bomb went off.

**ZZ.**   **April 3, 1986**, Sgt. Smith invited me to have a drink at the small bar on the compound. Sgt. Smith sat down at the bar as I was drinking a beer and then slid a shot of something over to me on the bar and told me to drink it. That was the last thing I remembered until the next morning when I woke up still on the base laying on my back on a small four-foot-long by ten-inch-wide bench with my legs and feet dangling, uncontrollably vomiting with my entire body covered in layers of vomit. I had never been that sick in my entire life and honestly felt that I was poisoned. That is when Sgt. Harold Machado told me that I was screaming and hollering at the CO, that I had cursed out Cpt Eccleston even though I did not remember doing it.

**AAA.  April 4, 1986,** I went back to Ft. Belvoir, VA.

**BBB.  April 5, 1986,** Libyan agents bombed the *La Belle* disco in West Berlin killing two American soldiers and a Turkish woman and wounding 229 others. The bombing had been planned by the Libyan secret service and the Libyan Embassy in what was East Berlin.

**CCC.** I had not planned for hours days or weeks in advance to go AWOL. I just went to the airport and purchased a ticket that same day. When I voluntarily turned myself into the Military Police at Ft. Belvoir, VA on April 7, 1986, I was still stick, had not slept that much the last three days and was suffering from jet lag. After 12 hours of questioning and threats by several military police at the same time that they were going to send me back to Greece by hook or crook in shackles without agreeing to address my security concerns for TS SCI Security Violations, and without the advice or consent of an Attorney, after I told them in writing I wanted a lawyer before I would talk to them, they typed up a statement and had me sign it stating, "I wanted to renounce my U.S. Citizenship". On July 21, 1988 I renounced my U.S. Citizenship in Belgrade, Yugoslavia.

**DDD.** On **April 15, 1986,** ten days after the Disco Bombing in Berlin, Germany President Ronald Reagan ordered retaliatory strikes on Tripoli and Bengazi, Libya, and reportedly killed Mr. Qaddafi's daughter.

**EEE.** The **1987 Greece bus attacks** refer to two separate attacks committed by the 17 November Group on buses carrying American military personnel near Athens, Greece.

**FFF.** The first attack, on April 24, 1987, wounded 16 Americans (four of which were civilians) and two Greeks (the bus driver and a civilian car driver nearby). A Hellenic Air Force bus was transporting American servicemen from a Greek base to the American-operated Hellenikon Air Base when a remote-controlled car bomb exploded, causing the bus to lose control and hit a tree. It was initially reported the bus was hit by a rocket attack. The chief of Greece's police called it a "well-planned crime". Greek Prime Minister Andreas Papandreou condemned the attack.

**GGG.** The second attack happened on August 10, 1987 and injured 11 Americans (one a female civilian) and the Greek bus driver. The attack happened near Voula beach to the south of Athens and was again caused by a remote-controlled car bomb on the road the bus was travelling on.

**HHH.**      The far-left 17 November Group had previously launched attacks against American targets in Greece.

minimaldefault256000

BEST COPY

x





**DEPARTMENT OF THE ARMY**
OFFICE OF THE INSPECTOR GENERAL
1700 ARMY PENTAGON
WASHINGTON DC 20310-1700

**January 27, 1994**

349

Records Release Office

Mr. Michael R. Meade
P.O. Box 300631
Fern Park, Florida  32730

Dear Mr. Meade:

This responds to your request, dated December 15,1993 for copies of Army Inspector General records.

The Department of the Army Inspector General Agency has no records as you describe. Accordingly, Lieutenant General Ronald H. Griffith, The Inspector General, denied your request.

Under current law, a no records response can be interpreted as a denial which may be appealed. You may appeal this action within 60 days of this letter's date. If you choose to do so, address your appeal letter through this office (ATTN:  SAIG—IR), to the General Counsel, Department of the Army, Washington, DC 20310

Sincerely,

Barbara Clemens

Barbara Clemens
Chief, Records Release Officer

COPY MADE BY VARMC, ST. LOUIS FROM A RECORD IN VA'S POSSESSION
Printed On 1/4/3 Recycled Paper

xi

BEST COPY

Then we were told at Fort Belvoir, Virginia, by Lieutenant Donahue to purchase a uniform so Michael could return to greece. Next thing happened was we were called by Lieutenant Donahue that Michael was dropped from the roll in greece and could not return. Again we called Captain Eccelston and he informed us that he had nothing to do with this decision.

3. Michael was taken to Fort Dix, New Jersey about 2 AM in the morning. We were not informed so we called Fort Dix, New Jersey and talked to SFC Dean 3 or 4 times a week and Michael did not go AWOL in New Jersey or SFC Dean would have told us this.

I spent 24 years in the Army myself, in fact I retired in 1967 and I was recalled to active Duty in 1970 and again I returned for another tour of duty in Viet Nam

COPY MADE BY VARMC, ST. LOUIS FROM A RECORD IN VA'S POSSESSION

CONT'D:

contacted and responded. MEADE was debriefed by CPT SOMICH for three consecutive days. After his debriefing from MI, MEADE again requested to see his lawyer, when he was ordered by 1LT Donahue to sign his Transportation Request and get on the flight arranged for him. This occurred on 11 April. His port call was set for 14 April. CPT Bucelle requested that Meade undergo a mental evaluation, to be conducted on 14 April 86. Further, she related that he couldn't really talk to Meade because of his clearance and that he was referring him to CPT O'Bryen. Meade's port call was then canceled. On Monday, 14 April, Meade was taken to Dewitt Army Hospital for mental evaluation. He was declared fit for duty and released to the MP's. During this time frame, calls were made to JA, MPCA, AG, Finance and Transportation to determine Meade's disposition. AG also contacted MILPERCEN for possible reassignment instructions. I was informed by AG (CW2 Ellis) that Meade would not be reassigned and would be returned to Greece. During the week of 14-18 April 86, every effort was made and exhausted to get a final disposition on Meade. It was finally determined that he would be returned to Greece under escort, since he had continuously stated that he would not return and was now considered a "Flight risk." Sgt Meade was brought into 1LT Donahue's office at approxim. 1545 hrs, 18 April 86 to be informed of this. 1LT Donahue told Meade that all efforts had been made and that the decision had been reached to return him to his unit in Greece. 1LT Donahue informed him that he had no option, that he would be issued a provisional pass and transportation request for his return. He asked Sgt Meade if he would sign the DD Form 460. Meade said nothing at first, then said he would not sign the pass form. 1LT Donahue then informed Meade that he was ordering him to return to Greece and ordered him to sign the DD Form 460, explaining that it was necessary to initiate his return. At this point Meade said nothing. 1LT Donahue then repeated the order. Again, Sgt Meade did not say

(2) init

STATEMENT (Continued)

anything. I then informed Meade that he had been given a lawful order by a superior commissioned officer to go to the Provisional Pass. I informed him that in accordance with the order stated on the DD Form 460 he was ordered to proceed by the most direct route on the first available transportation back to his unit and report directly to his commander. I then asked Meade if he was now refusing to sign and refusing to obey 1LT Donahue's order. Sgt Meade stated "yes," he was refusing to obey. I then informed Meade that he was under apprehension for failure to obey a lawful order and had him escorted to the MP station. ——— End of Statement ———

LARRY G. HARBINSON
SFC, USA
Chief, MP Investigations

**AFFIDAVIT**

I, _____, HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1 AND ENDS ON PAGE _____. I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT MADE BY ME. THE STATEMENT IS TRUE. I HAVE INITIALED ALL CORRECTIONS AND HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT. I HAVE MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR UNLAWFUL INDUCEMENT.

(Signature of Person Making Statement)

WITNESSES:

Subscribed and sworn to before me, a person authorized by law to administer oaths, this _____ day of _____, 19 _____

at _____

ORGANIZATION OR ADDRESS

(Signature of Person Administering Oath)

(Typed Name of Person Administering Oath)

ORGANIZATION OR ADDRESS

(Authority To Administer Oaths)

INITIALS OF PERSON MAKING STATEMENT          PAGE 3 OF 3 PAGES

☆U. S. Government Printing Office: 1979—230-663/6366

xiii

# DISPOSITION FORM

8

For use of this form, see AR 340-15; the proponent agency is TAGO.

| REFERENCE OR OFFICE SYMBOL | SUBJECT |
| --- | --- |
| ATZA-JA-SDC | SGT Michael R. Meade - Application for Mental Status Evaluation Under R.C.M. 706(a) |

| TO | FROM | DATE | CMT 1 |
| --- | --- | --- | --- |
| THRU: Provost Marshal Ft Belvoir, VA | CPT Donna A. Bucella Trial Defense Service Fort Belvoir, VA 22060 | 11 April 1986 CPT Bucella/ro/42850 | |

Office of the Staff Judge Advocate
Fort Belvoir, VA 22060

TO: Commander
United States Center and Fort Belvoir
Fort Belvoir, VA 22060

1. In accordance with Rule of Court-Martial 706(a), I hereby request that the Convening Authority order an inquiry into the mental condition of SGT Michael Meade. SGT Meade is from 70th USAFAO, APO 09693 stationed in Giantsa, Greece. He turned himself in from AWOL status at Fort Belvoir on 7 April 1986.

2. Based on my conversation with SGT Meade in my office, I am questioning his mental status. During my conversation with him, SGT Meade exhibited delusional behavior and thought processes. He has demonstrated that he is unable to respond to normal conversation. He has requested the termination of his U.S. Citizenship. I am unable to further inquire as to SGT Meade mental condition because of the status of this soldier.

3. This is an additionally unusual case, since I am unable to speak with SGT Meade, in that I do not have a clearance. CPT O'Bryan, SDC, Fort Belvoir will be able to advise him as to his status when she returns on Monday. After my conversation with Military Intelligence (Don Bator), I believe, for his sake, SGT Meade must speak with an attorney who has clearance. I am unable to provide any more information, as we had a difficulty in exchanging information because he can not speak with me about the issue at hand.

4. I have contacted CPT Platoni at Dewitt Army Hospital and she has assured me that he can be evaluated on Monday, 14 April 1986 at 0900 hrs. Based on my three different meetings with SGT Meade, I believe he needs to be psychiatrically evaluated.

5. In view of the foregoing, I request that a psychiatric evaluation for SGT Meade be conducted as soon as possible.

DONNA A. BUCELLA
Captain, JA
Defense Counsel

DA FORM 2496

---

**a.**　　　　　ˣⁱᵛ **April 7, 1986,** I made the following **Sworn Statement** to the Military Police at Ft. Belvoir, Virginia (Excerpts):

**b.**　　　　　After thorough thought I have come to the conclusion that I would like to renounce my American Citizenship. I do not want this to be taken negatively. I would never divulge any information about this country. I love this country and always will until I die.

**c.**　　　　　**This whole situation started in 1979 when I went to Italy in 1979 and stayed until 1982.**

**d.**　　　　　Being at a young and influential age (17) things were calm, nice and the people were very friendly. I could go anywhere in that country at anytime without having anybody bother me. Whereas in the area I live in here it is very dangerous to walk anywhere. One thing this is not in any way a political statement or in any way meant to reflect badly on the United States.

**e.**　　　　　**Upon arrival back to America in 1982 I felt it very hard to adapt to our customs again.** Everything seemed so fast and the people uncaring. That is when I began to realize that Europe was more suitable for me.

**f.**　　　　　**(Personally) you have to understand I have always kept to one friend or a few at most, never in a large crowd.**

**g.**　　　　　To refer back to the Army, I have always gave 100% at what I did.

**h.**　　　　　I went through as many schools as possible such as 31V, 31C, A4, V9, Jump School, Air Assault, Recondo, BLC, PLC, 11B by correspondence, NBC School, and some college courses. While in Italy I also made Soldier of the Quarter for my Artillery Group. Plus, all EER's and letters of commendations. But after many years of doing the same thing, it got **monotonous.**

　　　　　**B. Adjustment disorder** is a maladaptive response to a psychosocial stressor that occurs when an individual has significant difficulty adjusting to or coping with a stressful psychosocial event. The maladaptive response usually involves otherwise normal emotional and behavioral reactions that manifest more intensely than usual (taking into account contextual and cultural factors), causing marked distress, preoccupation with the stressor and its consequences, and functional impairment. AjD was introduced into the Diagnostic and Statistical Manual (DSM) of Mental Disorders in 1980.

### Signs and symptoms

**a.**　　　　　Sadness, hopelessness, lack of enjoyment, nervousness, anxiety, desperation, feeling overwhelmed, etc.

---

**b.**         Common characteristics of AjD include mild depressive symptoms, anxiety symptoms, and traumatic stress symptoms or a combination of the three. According to the DSM-5, there are six types of AjD, which are characterized by the following predominant symptoms: depressed mood, anxiety, mixed depression and anxiety, disturbance of conduct, mixed disturbance of emotions and conduct, and unspecified.

**c.**         The symptoms of adjustment disorder with disturbance of conduct can include: Behaviors that are outside the norms of society, outbursts of anger, substance use or abuse, emotional mood swings that are acted upon.

**d.**         The symptoms of adjustment disorder with mixed disturbance of emotions and conduct include depression, anxiety, and behavioral problems.

**e.**         Within **five years** of when they are originally diagnosed, approximately **20–50%** of the sufferers go on to be diagnosed with psychiatric disorders that are more serious. **(Excerpt: This whole situation started in 1979 when I went to Italy in 1979 and stayed until 1982. Upon arrival back to America in 1982 I felt it very hard to adapt to our customs again.)**

## BACKGROUND

**III.**   On **March 27, 1984,** I reenlisted in the U.S. Army as an E-5 Sergeant under the **Special Forces option** and initially underwent and successfully completed Airborne training for three weeks at Ft. Benning, Georgia.

**JJJ.**   While at Ft. Bragg, N.C. in 1984 I was in Special Forces training for **three months** which entailed numerous forced road marches with a very heavy "Jumbo" rucksack. During the bivouac stage of Special Forces Training, we were parachuted close to Camp Mc Call Training Base with a full rucksack and M16 Rifle before marching several miles to the Base.

**KKK.** Part of the Special Forces training in 1984 while at Camp Mc Call required simulated reconnaissance and combat missions carrying a heavy jumbo rucksack for extended periods of time. There was also the completion of an Obstacle Course with all types of obstacles. We also had a full day of hand-to-hand combat training in the mulch pit where we were required to repeatedly flip each other over onto our backs.

**LLL.** It was during this month-long training in 1984 at Camp Mc Call when I complained of lower back pain and was treated by the Special Forces Medics. I was unable to continue and was terminated from Special Forces training and reassigned to the 269th Aviation Battalion at Ft. Bragg, North Carolina. I felt severely depressed that I did not make it through the Special Forces Training, that I let myself down, my family down, and my country down.

**MMM.**         In **January of 1985** I was starting to feel better, and I volunteered for and successfully completed a two-week course for Air Assault Training at Ft Rucker, Alabama which entailed numerous forced road marches.

**NNN.** Between **25 Feb to 14 Mar 1985** while at the 269th Aviation Battalion I volunteered for and successfully completed Recondo School which entailed numerous forced road marches.

**OOO.** In the **March of 1985,** I felt emboldened and volunteered for Delta Force and was training over two months on my own at 4:00 AM in the morning with a 50-pound ruck sack forced marching and ruck running several miles around Simmons Army Airfield where I worked. Unfortunately, I didn't complete the course and it left me feeling depressed because I let myself down, my family and country down again.

**PPP.** In the late **spring, early summer of 1985** while stationed at the 269th Aviation Battalion at Ft. Bragg, N.C. when I was experiencing severe upper, lower back, feet and knee pain and went to the Troop Medical Clinic and was seen by the Flight Surgeon. The Flight Surgeon sent me to see the Orthopedic Surgeon at Womack Army Hospital for assessment where I was set up with an appointment 90 days later for a CAT scan. When I went to see the Orthopedic Surgeon, they conducted a CAT scan where I drank a dye, and my entire body was filmed. After the CAT scan I was seen by the Orthopedic Surgeon, a Lieutenant Colonel who stated she would not release the results of the CAT SCAN on her findings in the medical records to me.

**f.**     The medical records from when I went to Womack Army Hospital in **late spring early summer of 1985** for my upper, lower back, feet, and knees, and had the CAT SCAN to include the medical records from the Lieutenant Colonel disappeared and were never put into my medical records at the 269th Aviation Battalion.

**g.**     To date, I have been unable to obtain any military medical files from my enlistment in the U.S. Army between March of 1984 and June of 1986 after repeated requests to the storage facility at Page Blvd. in St. Louis, Missouri.

**h.**     In 2012 and again in 2015 I was diagnosed by Jewett Orthopedics in Orlando, Florida with Lumbar Disc Disease stemming from Pars Defect that usually starts as a teenager, the exact same time when I was serving in the U.S. Army in 1979 when I was 17, 18, 19 and 20. Pars Defect, leading into Spondylolisthesis and disc tears.

**i.**     Approximately one year later in June of 2015 I sent another request, this time through the Federal Archives to Womack Army Hospital for these medical records pertaining to the CAT scan in 1985 along with the notes from the Lieutenant Colonel and have not heard anything yet.

**QQQ.** In the **spring of 1985** while stationed at Ft. Bragg, N.C. I volunteered for a one-year hardship tour in Greece not knowing if I would ever be chosen. It was during that time that I had met and was dating my future wife Susan Rona

Sussman (A JEWISH WOMAN). We fell in love with each other and a few short months later we were married, and right afterwards I received the Orders for a Permanent Change of Station (PCS) to Greece. At this point, there was nothing I could do to change these Orders since I had already volunteered for this assignment several months prior to this.

**RRR.** In **July of 1985** I left Ft. Bragg, N. C. on TDY to Ft. Gordon, Georgia for three weeks and on **25 Jul 1985** successfully completed the V9 Satellite Operators Course. The V9 Satellite Operators Course was a mandatory requirement to have at my duty station being that we were operating the AN/MSC-64, Satellite Communications between are immediate headquarters (SETAF) in Vicenza, Italy and are higher headquarters in Germany (USAREUR) and ultimately to the Joint Chiefs of Staff at the Pentagon. After a brief leave, I flew to Athens, Greece for the hardship tour.

**SSS.** On **12 Aug 1985,** I received the Army Achievement Medal, first Oak Leaf Cluster that was for the periods of **11 May 1984 to 8 Jul 1985**.

**TTT.** While stationed at the 70th USAFAD in northern Greece I received a perfect score of 125 on my, "Enlisted Evaluation Report" for the period between **April 1985 to March 1986**.

**UUU.** Several weeks before going AWOL I had four impacted Wisdom teeth pulled on the U.S. Air Force Base in Athens, Greece that left me in stitches and unable to eat solid food, and at the same I was taking ***Percocet*** and Tylenol III for the pain that was prescribed to me by the Military Dentist.

**VVV.** I also had problems with my eyes staying bloodshot accompanied with severe headaches between January and February of 1986 and received treatment at the Hellenikon U.S. Air Force Base in Athens, Greece.

**WWW.** My 201 Military Personnel File along with my Military Medical and Dental File for my last enlistment in the U.S. Army between March 27, 1984, to June 30, 1986, disappeared.

65

---

xv

Plaintiff
Exhibit                    DEPARTMENT OF THE ARMY
                          US Army Training Center and Fort Dix              25
                              Fort Dix, New Jersey 08640-7225

ORDERS   126-76
                                                              6 May 1986

MEADE, MICHAEL R.   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   SGT  70th USAFAD (WA39AA) APO NY 09693

You are attached or released from attachment as shown.

Action:  You are attached to Co A, US Army Personnel Control Facility
         Fort Dix, New Jersey  08640-7225
Effective date:  19 April 1986
Period:  Indef
Purpose:  Pending reassignment orders from your parent unit.
Accounting classification:  NA
Additional Instructions:  a.  You are attached for rations, quarters, administra-
                              tion, UCMJ, and duty as the Commander may direct.
                          b.  Soldier surrendered 0950 hours 7 April 1986 to
                              military authorities at Ft Belvoir, VA.
                          c.  Attachment authorized by HQDA (DAPE-HRE) Mr
                              Dolbow pending reassignment orders.

Format: 440

FOR THE COMMANDER:

                                        ROGERS L. BEAN
                                        1LT, MP
                                        Asst Adjutant

DISTRIBUTION:
SGT MEADE (13)
PCF SIDPERS (MILPO)   (2 ea indiv)
PCF Reference Set   (1)
Ea indiv 201 File   (2)
AG Central Files   (2)
Ea indiv FDRF   (3 ea indiv)
OIC-CPU   (1)
Cdr, 70th USAFAD, APO NY 09693 (3)

xvi

DEPARTMENT OF THE ARMY
A Company, Personnel Control Facility
Headquarters, US Army Training Center and Fort Dix
Fort Dix, New Jersey 08640



SUBJECT:   Request for Discharge for the Good of the Service

---

Data Required by the Privacy Act of 1974
(5 USC 552a)

AUTHORITY:  Section 301, Title 5, United States Code and Section 3012, Title 10, United States Code.

PURPOSE:  To be used by the commander exercising general court-martial juris-diction over you to determine approval or disapproval of your request.

ROUTINE USES:  Request with appropriate documentation including the decision of the discharge authority will be filed in the MPRJ as permanent material and disposed of in accordance with AR 640-10, and may be used by other appropriate Federal agencies and State and local governmental activities where use of the information is compatible with the purpose for which the information was col-lected.

Submission of a request for discharge is voluntary.  Failure to provide all or a portion of the requested information may result in your request being dis-approved.

---

1.  I,  SGT Michael R. Meade                           , SSN 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      , hereby voluntarily request discharge for the good of the service under the provisions of AR 635-200, chapter 10.  I understand that I may request discharge for the good of the Service because of the following charge(s) which has (have) been preferred against me under the Uniform Code of Military Justice, each of which authorizes the imposition of a Bad Conduct or Dishonorable Discharge.

2.  I am making this request of my own free will and have not been subjected to any coercion whatsoever by any person.  I have been advised of the implications that are attached to it.  By submitting this request for discharge, I acknow-ledge that I understand the elements of the offense(s) charged and am guilty of the charge(s) against me or of (a) lesser included offense(s) therein contained which also authorize(s) the imposition of a Bad Conduct or Dishonorable Dis-charge.  Moreover, I hereby state that under no circumstances do I desire further rehabilitation, for I have no desire to perform further military service.

3.  Prior to completing this form, I have been afforded the opportunity to consult with appointed counsel for consultation (*in addition, I have consulted with (military counsel of my own choice who was reasonably available) (civilian counsel retained at no expense to the Government)).  (**Although I have received a lawful order to see consulting counsel, I persist willfully in my refusal to see him.) (***I have consulted with counsel for consultation who has fully advised me of the nature of my rights under the Uniform Code of Military Justice (the elements of the offense(s) with which I am charged, any relevant less included offense(s) thereto, and the facts which must be established by com-petent evidence beyond a reasonable doubt to sustain a finding of guilty; the possible defenses which appear to be available at this time; and the maximum

FDJA-FL-403 Replaces FDAG-FL-403 which may be used until exhausted
1 Feb 84

SUBJECT:  Request for Discharge for the Good of the Service

permissible punishment if found guilty) ~~(and of the legal effect and signi-~~
~~ficance of my suspended discharge).~~  (Although he has furnished me legal advice,
this decision is my own).

4.  I understand that, if my request for discharge is accepted, I may be discharged
under conditions other than honorable and furnished an Under Other Than Honorable
Discharge Certificate. I have been advised and understand the possible effects of
an Under Other Than Honorable Discharge and that, as a result of the issuance of su
a discharge, I will be deprived of many or all Army benefits, that I may be ineli-
gible for many or all benefits administered by the Veterans Administration, and tha
I may be deprived of my rights and benefits as a veteran under both Federal and Sta
law. I also understand that I may expect to encounter substantial prejudice in
civilian life because of an Under Other Than Honorable Discharge. I further under-
stand that there is no automatic upgrading or review by any government agency of a
less than honorable discharge and that I must apply to the Army discharge Review
Board or the Army Board for Correction of Military Records if I wish review of my
discharge. I realize that the act of consideration by either board does not imply
that my discharge will be upgraded.

5.  I understand that, once my request for discharge is submitted, it may be with-
drawn only with consent of the commander exercising court-martial authority, or wit
out that commander's consent, in the event trial results in an acquittal or the
sentence does not include a punitive discharge even though one could have been
adjudged by the court. This request for discharge is automatically withdrawn
should trial result in either an acquittal or a sentence which does not include a
punitive discharge. Further, I understand that if I depart absent without leave,
this request may be processed and I may be discharged even though I am absent.

6.  I have been advised that I may submit any statements I desire in my behalf,
which will accompany my request for discharge. Statements in my own behalf ~~(are)~~ M
mvem (are not) submitted with this request.

7.  I hereby acknowledge receipt of a copy of this request for discharge and all
inclosures submitted herewith.

                                    Michael R. Vreato  6 May 1(
                                    (Signature of respondent)

Having been advised by me of (the basis for his or her contemplated trial by court-
martial and the maximum permissible punishment authorized under the Uniform Code
of Military Justice) ~~(the significance of his or her suspended sentence to a Bade~~
~~Conduct or Dishonorable Discharge)~~; of the possible effects of an Under Other
Than Honorable Discharge if this request is approved; and of the procedures and ri(
available to him ~~member~~.  SGT Meade                    personally made the
choice indicated in the foregoing request for discharge for the good of the service

                          John K. Hutson  6 May 198C  JOHN K. HUTSON
                          (Signature of counsel)              CPT, JAGC
                                                          DEFENSE COUNSI

*To be used when appropriate. Such counseling is not to be used in lieu of
consultation with consulting counsel.
    **To be used only when a member under military control refuses to obey an order
see consulting counsel. (See paragraph 10-2c)
    ***To be used in all cases when a member had consulted with consulting counsel.

xvii



ATZD-HC SGT MEADE, Michael R. 2nd End
SSN: 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   (7 May 1986)
SUBJECT: Request for Discharge for the Good of the Service (Chapter 10)

DA, Headquarters, Headquarters Command, US Army Training Center and Fort Dix,
Fort Dix, New Jersey  08640-7225

THRU: Commander, United States Army Training Center and Fort Dix, ATTN:  Staff
Judge Advocate, Fort Dix, New Jersey  08640-5050

MAY 12 1986

TO: Commander, United States Army Training Center and Fort Dix, Fort Dix, New
Jersey  08640-5001

1.  I have personaly reviewed the enclosed request for Discharge for the good of
the Service submitted by Michael R. Meade, SGT, 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

2.  I recommend approval/~~disapproval~~.

3.  I recommend discharge with:

a.  ( X )  OTHER THAN HONORABLE CONDITIONS

b.  (  )  GENERAL

c.  (  )  HONORABLE

5 Encl
nc

STEVEN W. MAGNER
LTC, AV
Commanding

xviii

**CHARGE SHEET**

## I. PERSONAL DATA

| NAME OF ACCUSED (Last, First, MI) | 2. SSN | 3. GRADE OR RANK | 4. PAY GRADE |
|---|---|---|---|
| MEADE, MICHAEL R. | 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 | SGT | E-5 |

| 5. UNIT OR ORGANIZATION | 6. CURRENT SERVICE | |
|---|---|---|
| Co A, USAPCF, USATC & FD, Ft Dix, NJ | a. INITIAL DATE | b. TERM |
| | 27 Mar 1984 | 3 Years |

| 7. PAY PER MONTH | | | 8. NATURE OF RESTRAINT OF ACCUSED | 9. DATE(S) IMPOSED |
|---|---|---|---|---|
| a. BASIC | b. SEA/FOREIGN DUTY | c. TOTAL | | |
| $1075.20 | None | $1075.20 | Restricted to PCF | 19 Apr 1986 |

## II. CHARGES AND SPECIFICATIONS

10. CHARGE:   I   VIOLATION OF THE UCMJ, ARTICLE 86

SPECIFICATION:   :   In that Sergeant Michael R. Meade, US Army, Company A, US Army Personnel Control Facility, US Army Training Center and Fort Dix, Fort Dix, New Jersey, then of 70th US Army Field Artillery Detachment, APO New York 09693, did, on or about 4 April 1986, without authority, absent himself from his unit, to wit: 70th Field Artillery Detachment, located at APO New York 09693, and did remain so absent until on or about 7 April 1986.

Charge: II  Violation of the UCMJ, Article 90

Specification  :  In that Sergeant Michael R. Meade, US Army, Company A, US Army Personnel Control Facility, US Army Training Center and Fort Dix, Fort Dix, New Jersey, having received a lawful command from 1LT David F. Donahue, his superior commissioned officer, then known by the said Sergeant Michael R. Meade to be his superior commissioned officer, to sign a Department of Defense Form 460 (Provisional Pass), or words to that effect, did, at Fort Belvoir, Virginia, on or about 18 April 1986, willfully disobey the same.

## III. PREFERRAL

| 11a. NAME OF ACCUSER (Last, First, MI) | b. GRADE | c. ORGANIZATION OF ACCUSER |
|---|---|---|
| BEAN, ROGERS L. | 0-2 | Co A, USAPCF, USATC&FD, Ft Dix, NJ |
| d. SIGNATURE OF ACCUSER | | e. DATE |
| | | 8 May 1986 |

AFFIDAVIT: Before me, the undersigned, authorized by law to administer oaths in cases of this character, personally appeared the above named accuser this ___ day of ___May___ , 19 86 , and signed the foregoing charges and specification: under oath that he/she is a person subject to the Uniform Code of Military Justice and that he/she either has personal knowledge of or has investigated the matters set forth therein and that the same are true to the best of his/her knowledge and belief.

| DANIEL MANNING | Judge Advocate |
|---|---|
| Typed Name of Officer | Organization of Officer |

| 0-3 | |
|---|---|
| Grade | Official Capacity to Administer Oath (See R.C.M. 307(b)—must be commissioned officer) |

| | |
|---|---|
| Signature | |

12.
On ___8 May_____ , 19 _86_ , the accused was informed of the charges against him/her and of the name(s) of the accuser(s) known to me *(See R.C.M. 308 (a)). (See R.C.M. 308 if notification cannot be made.)*

ROGERS L. BEAN
*Typed Name of Immediate Commander*

Co A, USAPCF, USATC&FD, Ft Dix, NJ
*Organization of Immediate Commander*

O-2
*Grade*

_____
*Signature*

## IV. RECEIPT BY SUMMARY COURT-MARTIAL CONVENING AUTHORITY

13.
The sworn charges were received at __1000__ hours, __20 May__ , 19 _86_ at HQ's, Headquarters
*Designation of Command or*

Command, USATC&FD Ft Dix, NJ 08640 .
*Officer Exercising Summary Court-Martial Jurisdiction (See R.C.M. 403)*

FOR THE[1]   COMMANDER

THEODORE HAINES
*Typed Name of Officer*

Adjutant
*Official Capacity of Officer Signing*

First Lieutenant
*Grade*

_____
*Signature*

## V. REFERRAL; SERVICE OF CHARGES

| 4a. DESIGNATION OF COMMAND OF CONVENING AUTHORITY | b. PLACE | c. DATE |
|---|---|---|

Referred for trial to the _____ court-martial convened by _____

_____ , _____ 19 ____ , subject to the following instructions:[2] _____

By _____ Command or Order _____ of _____

_____
*Typed Name of Officer*

_____
*Official Capacity of Officer Signing*

_____
*Grade*

_____
*Signature*

5.
On _____ , 19 _____ , I (caused to be) served a copy hereof on (each of) the above named accused.

_____
*Typed Name of Trial Counsel*

_____
*Grade or Rank of Trial Counsel*

_____
*Signature*

FOOTNOTES: *1 — When an appropriate commander signs personally, inapplicable words are stricken.*
*2 — See R.C.M. 601(e) concerning instructions. If none, so state.*

☆U.S. G.P.O. 1984-461-033/2702

xix

DEPARTMENT OF THE ARMY
US Army Training Center and Fort Dix
Fort Dix, New Jersey  08640-7225

ORDERS  163-81                                    12 June 1986

1.   MEADE, MICHAEL R.  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  SGT Co A, USAPCF (W1DC13B)
     Ft Dix, NJ  08640-7225

You are reduced in grade as indicated below.

From:  SGT
To:  PV1
Effective date:  12 May 1986
Authority:  AR 600-200, para 6-11
Format:  306

2.   MEADE, MICHAEL R.  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  PV1  Co A, USAPCF (W1DC13B)
     Ft Dix NJ  08640-7225

You are reassigned to US Army Separation Transfer Point as indicated for
separation processing.  After processing, you are discharged from component
indicated.  If you are delayed in reporting to the Separation Transfer Point,
you still must report to the Separation Transfer Point as soon as possible
or as authorized to receive a new effective date of discharge.

Assigned to:  USA Transfer Point, (W1DC1E9) USATC&FD Ft Dix NJ  08640-7230
Reporting date:  30 June 1986
Component:  R
Date of discharge (unless changed or rescinded):  Same as reporting date.
Additional instructions:  (a) Individual will telephonically notify
     Commander, USA Transfer Point, Telephone:  Area Code (609) 562-2174/5084
     upon receipt of DD Form 214, Discharge Papers, if anything is wrong with
     the DD Form 214.  (b)  Copies of these orders and FDCF-FL-402 will be
     provided to individual, via mail at address indicated in distribution at
     earliest date possible.  (c)  Individual authorized to be discharged in
     absentia UP AR 635-200.

FOR ARMY USE
Authority:  AR 635-200
HOR:  Oxon Hill, MD
Pl EAD or OAD:  Baltimore, MD           PEBD:  NA
MDC:  7BE6                               CIC:  NA
Format:  501                             Aval date:  NA

xx

  

ATZD-CG  (ATZD-HCZ/          ) 3rd End
SUBJECT:  Request for Discharge for the Good of the Service

DA, Headquarters, US Army Training Center and Fort Dix, Fort Dix, New Jersey
08640-5000

TO:  Commander, Headquarters Command, US Army Training Center and Fort Dix, Fort
     Dix, New Jersey  08640

1.  I have personally reviewed the request for discharge for the good of the
service in the case of Sergeant Michael R. Meade, US Army, 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, Co A, US
Army Personnel Control Facility, US Army Training Center and Fort Dix, Fort Dix,
New Jersey.

2.  The request is approved, soldier will be issued an Other Than Honorable
Discharge Certificate, and is hereby reduced to the lowest enlisted grade.

1 Encl                              THOMAS W. KELLY
nc                                 Major General, USA
                                   Commanding